UNITED STATES of America, Appellee,

v.

Virgil D. DARDI, Robert B. Gravis, Charles Rosenthal and Charles Berman, Defendants-Appellants.

No. 187, Docket 28030.

United States Court of Appeals Second Circuit.

Argued Dec. 5, 1963.

Decided March 17, 1964.

**320**

Feldman, Kramer, Bam & Nessen, New York City (Maurice N. Nessen and Merton Sarnoff, New York City, of counsel), for appellant, Virgil D. Dardi.

Irwin L. Germaise, New York City (Bernard B. Polak, of counsel and Phillip C. Samuels, New York City, on the brief), for appellant, Robert B. Gravis.

John A. Vassallo, New York City, for appellant, Charles Rosenthal.

Gallop, Climenko & Gould, New York City (Milton S. Gould and Jonathan W. Lubell, New York City, of counsel), for appellant, Charles Berman.

Gerald Walpin, New York City (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Peter H. Morrison, Robert J. Geniesse and Gerald Abrams, Asst. U. S. Attys., of counsel), for the United States of America.

Before MOORE, FRIENDLY and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge.

Four defendants, Virgil D. Dardi, Robert B. Gravis, Charles Rosenthal and Charles Berman, appeal from judgments of conviction that followed a jury verdict in which they were found guilty of unlawfully participating in the distribution of unregistered shares of United Dye and Chemical Corporation stock. Appellant Dardi was President and a Director of United Dye, a company long traded on the New York Stock Exchange. Appellants Berman, Gravis and Rosenthal were broker-dealers who dealt in the sale of stock in the over-the-counter market.

*The Indictment*

The indictment, which named thirty-three defendants and seventeen co-conspirators, contained thirty counts arranged in three general categories: Conspiracy (Count 1), market manipulation (Counts 2–5) and sale of unregistered securities (Counts 6–30). Because of severances and pleas of guilty, of the thirty-three defendants only the four appellants and one corporate defendant participated in the trial to its completion.[1]

---

1. Prior to trial, the following defendants were severed: I. Vincent Powell, Michael Kramer, Murray Porter, Edward Stone, Vincent P. Barry, Oscar L. Gould, Jacob Klein, Albert Wood Moore, Garry Hochman, Robert Allen and Charles Landeau, all characterized by the Government as "salesmen." Defendants Louis Levin and G. F. Rothschild, Inc., were also severed prior to trial.

Four defendants entered pleas of guilty to portions of the indictment prior to trial: McGrath Securities Corporation (Counts 1, 6, 7, 8, 9, 17, 18 and 19), I. F. Stillman Inc. (Counts 1, 15, 27 and 28), Sidney Barkley (Count 1) and Irving Frank Stillman (Count 1).

Nine defendants pleaded guilty during trial: Samuel S. Garfield (Count 1); Allen K. Swann (Count 4); Allard Roen (Count 1); Herman W. Brann (Counts 4 and 5); Irving Pasternak (Counts 1, 6, 7, 8, 9, 20, 24, 27, 29 and 30); Garland L. Culpepper, Jr. (Counts 1 and 10);

Count 1 charged a conspiracy, 18 U. S.C. § 371, by Dardi, Berman, Gravis, Rosenthal and others illegally to sell unregistered United Dye stock to the public in violation of specified sections of the Securities Act of 1933 (15 U.S.C. §§ 77e (a), 77e(c), 77q(a), 77x), the Securities Exchange Act of 1934 (15 U.S.C. §§ 78i (a), 78j(b) and 78ff(a)), Rules and Regulations promulgated under both acts by the Securities and Exchange Commission and the Mail Fraud Statute (18 U.S.C. § 1341), and to defraud the United States by impeding the functions of the Securities and Exchange Commission (SEC). The methods used to obtain control of United Dye, the use made of other companies such as Franklin County Coal Corporation and Handridge Oil Corporation, the illegal sale of unregistered stock and the illegal market manipulations were set forth in twelve detailed paragraphs and subparagraphs. The thirty-two overt acts alleged in the indictment included specific meetings and letters. Counts 2, 4 and 5 charged Dardi, Garfield, Pasternak and others with illegally pegging and stabilizing the price of United Dye stock on the New York Stock Exchange. In counts 6 through 30 the broker-dealers, Rosenthal, Berman, Gravis and others, were charged with the use of the mails in connection with specific sales of United Dye stock.

Each appellant was convicted on the first count. Dardi was convicted on each of three market manipulation counts under 15 U.S.C. §§ 78i(a) (2), (a) (6) and 78ff(a) and 18 U.S.C. § 2. Berman, Gravis and Rosenthal were convicted on counts charging the illegal sale of unregistered United Dye stock in violation of 15 U.S.C. § 77e(a) (1), 77x and 18 U.S.C.A. § 2.[2]

Rockwell Securities Corp. (Counts 1 and 10); Joseph Herbert Lederer (Count 1) and J. H. Lederer & Co. (Counts 1 and 30). Cornelius DeVroedt was severed due to illness; thereafter, Cornelius DeVroedt, Inc. entered a plea of *nolo contendere* to Counts 1, 24, 25 and 26.

I.

## OUTLINE OF THE EVIDENCE

As an overture to an analysis of the many legal and factual grounds urged for reversal, it is necessary to describe in brief outline the factual background against which the case must be viewed. The Government's case was constructed principally on the testimony of Alexander L. Guterma, the Chairman of the Board of United Dye and the central figure in the complex chain of transactions which he described to the jury. The Government alleged, and the jury must have found, the existence of a single multi-stage conspiracy which had as its central purpose distribution to the public of unregistered United Dye stock. In the preliminary stages of the scheme, the conspirators gained control of United Dye and created a corporation with which it was later merged, Handridge Oil Company. As a result of the Handridge-United Dye merger, the conspirators obtained 575,000 "control" shares of United Dye stock. Shortly thereafter, through manipulation of the market on the New York Stock Exchange and misleading and fraudulent statements to customers the shares were sold in the over-the-counter market without the registration required by the federal securities laws. A résumé of Guterma's testimony on direct examination supplies most of the details on which these ultimate facts were grounded.

### Preparations for the Merger of United Dye and Handridge Oil

In June of 1955, Guterma joined defendants Samuel Garfield and Irving Pasternak in their efforts to acquire the Franklin County Coal Corporation. Guterma testified that his partnership with Garfield and Pasternak was for the pur-

2. The jury found Rosenthal not guilty on Count 15, Berman not guilty on Counts 14, 24, 25 and 26 and Gravis not guilty on Count 16. Defendant R. B. Gravis, Inc. was convicted on Counts 1 and 29, but found not guilty on Count 16.

pose of merging Franklin, then owned by John and Clint Murchison, Jr., with a company listed on either the New York or American Stock Exchange and then selling the stock of the listed company as thus acquired. Franklin's two major assets, coal lands in Illinois, long inactive, and an oil pipeline in Wyoming, had been unable to muster a profitable return for several years. To effect the sale, Garfield and Pasternak gave their promissory note for $510,000 as the full purchase price, leaving the stock with the Murchisons as security. The only cash to change hands at this point was a loan of $800,000 from Garfield, Pasternak and Guterma to Franklin to redeem a like amount in mortgage debt to the Murchisons.

Since the Franklin stock was pledged with the Murchisons, and would be unavailable for a merger with a more substantial corporation, Guterma, Garfield and Pasternak found it necessary to improvise on their original plan. To this end Swann, their attorney, formed Handridge Oil Corporation to which Garfield and Pasternak conveyed their interest in Franklin. In exchange, the 500,000 shares of Handridge were transferred to Swann, "in trust" for the three partners. Guterma testified, however, that subsequently much of the Handridge stock was held by nominees, to disguise Guterma's, Garfield's and Pasternak's status as "control persons" under the 1933 Securities Act.

Meanwhile, Guterma had become acquainted with Dardi, already an officer and director of United Dye, and in the latter part of June, 1955, had agreed to purchase a block of 38,500 shares of United Dye stock through Dardi at ten dollars per share. There were at this time about 168,000 shares of United Dye outstanding. Soon thereafter, Guterma distributed about two-thirds of the 38,-500 shares as follows: Pasternak, for himself and Garfield, bought 12,000 shares; 1,000 shares each went to co-conspirators Robert Eveleigh, a Guterma aide, and Robert Leonhardt, owner of McGrath Securities Corporation, a de-

fendant brokerage house which was later to sell United Dye shares; and Dardi retained an option, later exercised, to buy 6,500 shares to complement the 17,700 shares he already held. By early September, 1955, Guterma had been elected Chairman of the Board, Dardi President, Eveleigh Treasurer, and Alexander Timm, one of Dardi's associates, Assistant Secretary.

While Guterma was establishing himself at United Dye, he discussed with Dardi the prospects of a merger between United Dye and Franklin County Coal. A committee of United Dye Directors, including Dardi, was appointed to look into the proposal. Originally, Guterma represented Franklin in the negotiations with the committee but when he became a director, he negotiated on behalf of United Dye with Pasternak and Swann. The proposed merger was also discussed with the Committee on Stock Lists of the New York Stock Exchange, which eventually granted United Dye's application to list the additional shares to be issued in the merger. In early December 1955, a merger agreement was executed under which United Dye was to issue 575,000 shares of its stock (then selling at approximately $30 per share) in exchange for the 575,000 shares of Handridge. Handridge was required to have at the closing, in addition to unencumbered Franklin shares, $750,000 in cash. Guterma testified that this $750,000 actually came from the sale of 75,000 Handridge shares to, among others, United Dye directors, including Dardi, who concealed their ownership through an escrow agent.

To Guterma the then inflated price of United Dye stock was not conducive to execution of the merger, and he discussed the situation with Dardi and Hyman Lehrich, also an officer and director of United Dye, as well as with Garfield and Pasternak in October 1955. To meet the problem without running afoul of the securities laws governing the sale of control stock, Guterma and Pasternak entered into a series of "loan" agreements with various "borrowers," in fact nomi-

nees, who immediately sold the "borrowed" stock reaping substantial profits in the process. The Government also adduced evidence that coincident with the sales of Guterma and Pasternak, Dardi through nominees disposed of the 6,500 shares he had purchased from Guterma under the June 1955 agreement. The cumulative effect of the sale of substantially the whole 38,500 share block achieved the desired result of driving the price of United Dye from a high of $38 per share in November 1955 to approximately $16 on May 1, 1956 when the merger was to close.

### Effectuation of the Merger of United Dye and Handridge.

The merger agreement between United Dye and Handridge stipulated that Handridge was to own, at the date of the merger, the Franklin stock, then pledged with the Murchisons as security for Garfield and Pasternak's $510,000 note, free and clear. Garfield and Pasternak, according to Guterma, did not have the funds to pay off the note. Therefore, Guterma, Dardi, and Lehrich, in April 1956 caused the merger agreement to be modified to delete the free and clear requirement and to provide that United Dye would assume the note and that Garfield and Pasternak would pay United Dye $510,000 plus the $9,000 interest that had by then accrued.

### Bon Ami

About this time Dardi learned that 63,000 shares of the Bon Ami Company, which had over $3,000,000 in liquid assets, were available for purchase. By May 1, 1956 Dardi had executed an agreement with certain Bon Ami stockholders which provided for United Dye's payment of $1,350,000 (to be borrowed from Guterma's F. L. Jacobs Corporation) and the delivery of its $350,000 promissory note in exchange for 63,000 Bon Ami shares.

Guterma testified that control of Bon Ami was acquired to enable Garfield and Pasternak to satisfy the $519,000 obligation owed by them to United Dye. Moreover, his testimony, as well as other evidence on this phase of the case, could well support the conclusion that the Bon Ami treasury after the merger was used to satisfy the obligations incurred by United Dye in the very process of acquiring its 63,000 Bon Ami shares. To substantiate Guterma's testimony, the Government introduced evidence of various "loan" transactions involving Garfield and Pasternak and, as Directors of Bon Ami, Guterma and Dardi. Immediately after the merger, the Bon Ami Executive Committee formed a subsidiary, B. A. Royalties, Inc., which was used as a conduit for transferring $860,000 of Bon Ami funds to Garfield and Pasternak. Out of the $860,000 Garfield and Pasternak, by check back dated to May 1, 1956, paid $519,000 to United Dye in payment of their note to the Murchisons; and, at the same time, they transferred $140,000 to United Dye, purportedly as a loan. Subsequently, so that Bon Ami would be repaid, Bon Ami transferred to Diversified Oil & Mining Corporation (D. O. M.), recently organized and controlled by Guterma, Garfield and Pasternak, $1,250,000 in exchange for a similar amount in D. O. M. debentures secured by D. O. M.'s properties. The same day, D. O. M. transferred $915,000 to Garfield and Pasternak, purportedly in partial payment for oil properties, although those properties had been previously pledged to Bon Ami, and $250,000 to United Dye as a loan. From the $915,000 received from D. O. M., Garfield and Pasternak repaid the original $860,000 loan from Bon Ami. According to the Government, the final step in this series of transactions was the payment by United Dye of the obligations it had incurred in its purchase of Bon Ami, $1,700,000.

### The Garfield and Pasternak Guarantee

Under the United Dye-Handridge merger agreement, Garfield and Pasternak had guaranteed that the Franklin pipeline would, for each of the years 1956 and 1957 receive a minimum profit before amortization and depreciation of $1,200,000. As security, Garfield and Pasternak pledged 85,000 United Dye shares they had received in the merger

to United Dye. Less than two months after the merger, Guterma recommended to the United Dye Board that this guarantee be waived in return for a cash payment of $800,000. As it happened, according to Guterma, Garfield and Pasternak transferred to United Dye $450,000 in cash (obtained partially from United Dye and partially from D. O. M.) and 115,000 shares of D. O. M. stock, arbitrarily valued at $250,000 although actually worth only $184,000. In return, they obtained the 85,000 shares, then worth $1,200,000, which could be sold in the forthcoming distribution.

### Sales to the Public of United Dye Shares Issued in the Merger

The third objective of the Guterma-Garfield-Pasternak partnership was the sale to the public of 500,000 shares of United Dye, amounting to more than 50 per cent of the stock outstanding, acquired in the May 1956 merger. To avoid the practical and legal difficulties attendant upon the sale of such a large block on the New York Stock Exchange, the three partners had agreed to sell the shares in the over-the-counter market. It was at this point, during the summer of 1956, that the broker-dealers commenced their operations. While the United Dye stock was being stabilized artificially on the Stock Exchange, the broker-dealers (enlisted by Guterma), primarily by way of hard-selling long distance telephone calls and misleading tout sheets (so-called "boiler room" tactics), sold the stock to the public, knowing that no registration statement had been filed. The firms involved, including I. F. Stillman, Inc. (appellant Rosenthal), R. B. Gravis, Inc. (appellant Gravis) and G. F. Rothschild & Company (appellant Berman) were to be paid a fifteen per cent commission plus one dollar in cash for each share sold.

### Stabilizing the Market

The success of the telephone sales campaign depended in large measure on the price at which United Dye was being traded on the Stock Exchange. To maintain the price, the shares sold initially over-the-counter had to be absorbed when offered on the Exchange. Consequently, Guterma made the necessary "pegging" arrangements with his aid, Hughes, defendant Brann, appellant Rosenthal, and defendant Sidney Barkley, Rosenthal's associate in I. F. Stillman & Co.

Before the merger, Guterma had instructed Hughes to watch the market price and to purchase any large amounts of United Dye stock for which there was no demand. Hughes complied by opening several brokerage accounts and purchasing in the name of relatives, friends and nominees. Hughes' efforts proved inadequate, however, when the boiler room sales began in earnest. To alleviate the problem, Dardi introduced Guterma to Brann who had expressed an interest in selling United Dye shares in Europe and in North Africa where he owned a bank. Brann could take advantage of 30 per cent margin, insure the anonymity of anyone conducting a market stabilization program, and tout the stock in his bank's market letter. An arrangement was agreed upon wherein Brann was to buy United Dye stock on the New York Exchange, the margin coming from Guterma, and then to sell the stock abroad. Although the Brann arrangement eventually bogged down as a result of Brann's alleged double-dealing the net result of the stabilizing efforts of Hughes, Brann, Rosenthal and Barkley proved successful.

The sales to the public and accompanying market manipulation, which lasted until early November 1956, completed the venture which Guterma, Garfield and Pasternak had undertaken a little over a year earlier, and in October they met at Clare, Michigan to discuss dividing the spoils amongst themselves. In April 1957 Guterma resigned from United Dye and began to sell the 83,000 shares he then owned. Dardi, according to Guterma, learned of these sales and, after reminding Guterma of Guterma's agreement to give him first preference, purchased 40,000 shares from Guterma at the then market price of $7.

## II.

### SUFFICIENCY OF THE EVIDENCE

■■ Because a large portion of the errors asserted by appellants are bottomed on disputed questions of fact and sufficiency of proof, it is appropriate to advert to certain long established principles of appellate review. A jury of twelve has heard all the testimony, explanations of the meaning of a vast number of exhibits, and the exhaustive summations of counsel, and has been instructed on the applicable legal rules. Their verdict, after due consideration, was that appellants were, on the facts and the law, guilty of substantive crimes and of conspiracy. It was within the exclusive domain of the jury to choose between competing inferences of fact, United States v. Grunewald, 233 F.2d 556, 563 (2d Cir. 1956), rev'd on other grounds, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). On appeal the evidence must be considered in a light most favorable to the Government. United States v. Tutino, 269 F.2d 488, 490 (2d Cir. 1959). Moreover, microscopic dissection of bits and pieces of evidence when laid out in a cold record overlooks the truism that "logically the sum is often greater than the aggregate of the parts, and the cumulation of instances * * * may have a probative force immensely greater than any one of them alone." United

States v. White, 124 F.2d 181, 185 (2d Cir. 1941).

### Substantive Counts (the Broker-Dealers)

■■ The broker-appellants' convictions stem from their unlawful sales of unregistered stock. They do not dispute that they sold the stock or that it was not registered; rather, they claim that they were ignorant that the stock required registration at all. Section 5(a) of the Securities Act of 1933, 15 U.S.C. § 77e(a) sets up a general prohibition on the sale of unregistered securities with certain exemptions.[3] No exemption is provided for an "underwriter" defined by the statute [4] as any person who offers or sells a security for an "issuer." An "issuer," in turn, is defined in terms of "control." Since the evidence clearly establishes that Guterma, Garfield and Pasternak were in "control," and since the broker-appellants sold for one or more such "issuers," each was an "underwriter" under the Act. See United States v. Crosby, 294 F.2d 928, 939–40 (2d Cir. 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). Through this circuitous route it is apparent that the crucial issue as to the broker-dealers' guilt is whether they knew that they were selling for a "control" group. In United States v. Crosby, supra, this Court found that there was insufficient evidence that the broker-dealers "knew

3. 15 U.S.C. § 77e(a) provides:
 Prohibitions relating to interstate commerce and the mails.
 "(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
 "(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
 "(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

4. 15 U.S.C. § 77b(11) states:
 "The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."

or should have known they were 'underwriters' in terms of the Securities Act." The evidentiary problem here is whether the link missing in Crosby has been supplied.

*Berman*

Berman has energetically undertaken the task of explaining away all the undesirable inferences that can be drawn from the evidence adduced against him. A similarly meticulous analysis of various transactions and meetings was urged to the jury. We set out here a few of the facts from which the jury might have justifiably chosen to disregard Berman's explanations of his conduct. Berman came to Guterma and asked how many shares of United Dye were available and what the compensation was. He was told that about 150,000 shares "could be sort of held for him on an option basis." When Berman pressed for more, he was informed that any amount he could sell would be forthcoming and that "there was in excess of 200,000 to 250,000 available." When Berman asked of compensation, Guterma said that brokers were getting 15 per cent by check and $1 in cash per share. Guterma also told him that the stock should be sold for a specific amount—at the closing New York Stock Exchange price. There was also evidence tending to show that six "vendor" letters, addressed to Garfield, Pasternak, Swann and three others were all sent instead to Swann, with whom Berman dealt, and that these letters were a subterfuge. Perhaps even more damaging was Guterma's testimony that, when Berman expressed concern about the drop in United Dye price, Guterma replied that all efforts were being made regarding market stabilization and that Berman should not be disturbed about it.

Berman argues that it was only logical to ask the chief executive of a corporation if large blocks of shares were available for sale; that in discussing market price with Guterma he hoped that as Chairman of the Board Guterma would influence the market through legitimate corporate actions; and that the only

inference that can be drawn from the "vendor" letters is that copies were sent to Swann in his representative capacity. Whatever the various inferences it *might* have drawn, the jury heard Berman's explanation of his conduct and discredited it. The evidence presented describing the circumstances of Berman's participation in the distribution is sufficient to support the jury's conclusion that he knew that his sales were for a control group.

Berman also asserts his good faith reliance on legal opinions that the stock was tradeable without registration, as did the broker-dealers in United States v. Crosby, supra. The Crosby case makes it clear, however, that reliance on the opinion of counsel is but one consideration which may be persuasive in the jury's determination of the defendant's state of mind. Among other factors which the jury could consider as going to Berman's good faith reliance on legal advice was the fact that the letters expressing the opinion that the stock could be sold without registration specifically made the assumption that the sales were not being made for "control" persons. And, as pointed out, the jury could have inferred that when these opinions were rendered Berman knew that he was dealing with control persons.

*Gravis*

Gravis first expressed his interest in selling United Dye to Hughes, who arranged a meeting with Guterma. Guterma told Gravis that the amount of available shares was in excess of one-half million, and assured him that these shares would not be sold on the Exchange so as to undercut the price. Guterma further informed Gravis that he could acquire shares for distribution, and that "the brokers" were receiving 15 per cent commission by check and $1 in cash. There was also evidence that Gravis was one of the brokers who sent periodic "confirmations" of sales to Hughes at United Dye. Finally, these was evidence that Gravis made false statements to SEC Investigator Pitchardo from which the jury might

have concluded that Gravis knew full well that his sales were unlawful and that Guterma was in a control position.

### Rosenthal

Guterma's testimony alone provides a sufficient basis on which the jury could have decided that Rosenthal knew he was selling for Guterma and his control group. Guterma told Rosenthal that he (Guterma) and his "associates," Garfield, Pasternak, Swann and others, wanted to sell United Dye shares in the over-the-counter market. He further informed Rosenthal that the group controlled a total of approximately 550,000 shares and that "substantially all of these shares would be sold." In addition, testimony of Barkley, Rosenthal's former partner, was that he and Rosenthal had actively engaged in market "pegging" while the United Dye shares were being retailed, under Guterma's supervision.

### The Conspiracy Count

■ The broker-appellants make the complaint that the Government failed to prove the single conspiracy alleged in Count 1; that the proof showed that any conspiracy to sell securities to the public was independent of a separate and prior conspiracy involving the creation of the shares and their distribution to the co-conspirators and nominees. The prejudicial effect of the mass of evidence introduced as to the activities of Guterma and his "executive" group, it is argued, requires reversal on the substantive counts as well as the conspiracy count.

■ As was recently said in United States v. Crosby, supra, at 945 of 294 F.2d, "[w]hether a scheme is one conspiracy or several is primarily a jury question, since it is a question of fact as to the nature of the agreement." In the case at bar the jury was so instructed.

■ There was abundant evidence to show the complicity of Guterma, Garfield and Pasternak, among others, in one plan consisting of a progression of carefully related transactions which had as its ultimate purpose the sale to the public of unregistered stock. Indeed, Guterma testified that this was precisely what his venture with Garfield and Pasternak was all about. But it is not fatal that the broker-appellants were not shown to have been aware of each part of the unlawful plan. See United States v. Benjamin, 328 F.2d 854 (2d Cir. 1964); United States v. Crosby, supra at 945 of 294 F. 2d; United States v. Agueci, 310 F.2d 817 (2d Cir. 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). It is only necessary to show that appellants knew of the conspiracy and that they associated themselves with it. United States v. Bentvena, 319 F.2d 916, 928 (2d Cir. 1963), cert. denied [Ormento v. U. S., Di Pietro v. U. S., Fernandez v. U. S., Panico v. U. S., 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271; Galante v. U. S., 375 U.S. 940, 84 S.Ct. 346, 11 L. Ed.2d 271; Loicano v. U. S., 375 U.S. 940, 84 S.Ct. 353, 11 L.Ed.2d 272; Mancino v. U. S., 375 U.S. 940, 84 S.Ct. 354, 11 L.Ed.2d 272; Sciremammano v. U. S., 375 U.S. 940, 84 S.Ct. 355, 11 L.Ed.2d 272; Mirra v. U. S., 375 U.S. 940, 84 S.Ct. 360, 11 L.Ed.2d 272]; United States v. Aviles, 274 F.2d 179 (2d Cir. 1959), cert. denied, sub nom. Genovese v. United States, 362 U.S. 974, 80 S.Ct. 1059, 4 L.Ed.2d 1010 (1960).

We must conclude that there was sufficient evidence from which the jury could find that the broker-appellants knew that Guterma represented a control group acting in concert for the purpose of selling to the public unregistered stock. Upon the facts here, the sufficiency of the proof on the conspiracy count is bolstered by the determination of the adequacy of proof on the substantive count. See United States v. Crosby, supra, at 940 of 294 F.2d.

### III.

#### CONDUCT OF THE TRIAL

Dardi, apart from points dealing with claims of specific evidentiary errors, asserts that he was denied a fair trial (1) because of the trial court's failure to grant proper and timely pre-trial production of documents and a bill of particu-

**328**

lars; (2) because of the extended duration of the trial and the court's toleration of "colloquy"; (3) because of the charge; and (4) because of unfair and discriminatory treatment by the trial court.[5]

*Pre-Trial*

 Probably no experienced trial counsel has ever commenced a trial feeling that every necessary item had been fully and adequately prepared and that nothing remained to be done during the trial. If so, it is an experience enjoyed by very few. The usual pattern, particularly in the complicated and protracted case, is to spend most of the time after daily recess preparing for the morrow. And certain it is that trial counsel, if worthy of the title, never are satisfied that all possibilities of law and fact have been explored and that all the arguments essential to victory have been made. Limitations of time, space and the finite mind apply even to lawyers and it is against the background of this unfortunate but actual limitation that this trial must be viewed.

The indictment was filed on July 14, 1961. It was by no means in skeleton form. The conspiracy was alleged in detail and thirty-two overt acts were set forth. The particular statutes claimed to have been violated were set forth. The nature of the conspiracy, namely, the sale of unregistered stock, the rigging of the market and the fraudulent sale to the public were alleged not in generalities but with reference to the specific means used for these purposes. The substantive counts dealing with market manipulation and sale were equally definite. Surely these appellants were adequately informed of the charges against them.

They complain, however, that they were not allowed sufficient pre-trial discovery and inspection and a detailed bill of particulars. In September 1961 defense counsel filed their motions for discovery and particulars. In December a single judge was appointed before whom all matters were to be heard. Early in February 1962 the court denied the motions. This denial, however, did not cut off the defense from information. On February 8, 1962 the Government served an eight-page bill of particulars and offered to make available some sixty-eight categories of documents. Pre-trial conferences were held during February with the not unusual result of the Government claiming that it was being over-liberal in its disclosures and the defense contending either that it was not enough or too much to be encompassed before the commencement of the trial. It was at this point that the trial court, faced with the necessity of commencing the trial at some time, made the suggestion that defense counsel could prepare as the case went along. No inference can be drawn from this remark that defense counsel approached the day of trial completely unprepared and that the trial court callously told them to prepare as they went along. They had been aware of the charges against their clients for some eight months. Their motions, the pre-trial conferences, the "minutiae" in the Government's bill of particulars, of which they now complain, all refute their present claim.

Even after the commencement of the trial (February 27, 1962) defense counsel had many opportunities for further preparation usually not afforded in the average trial. The Government's case was presented in substantial part through Guterma whose testimony commenced on March 9, 1962. A week's adjournment, caused by a defendant's illness, occurred between March 13th and 20th. The first occasion for cross-examination by any of appellant's counsel did not arise until April 16th. Investigation into each phase of his testimony surely could have been made in this interval.

Lastly and most determinative is the fact that Dardi makes no showing on this appeal that the facts would have been other or different had he had an additional year or six months in which to

---

5. The other appellants join in these contentions.

prepare. Nor does he point even now to any facts which could have been developed which would have so radically changed the fact picture that, in effect, a new trial should be granted.

### The Duration of the Trial

 All the evils attendant to a long trial (February 27, 1962 to January 31, 1963) are stressed by appellants: the possibility of the jury being unable to remember the testimony given in the earlier stages of the trial, the jury's impatience in being deprived of the opportunity to attend to their own affairs, their expressed resentment at short court sessions, abandonment of any summer vacation plans and their restlessness over the long periods involved in court-counsel colloquy.

 There can be no scale by which to measure the proper length of a trial. See, e. g., People v. Clemente, 8 N.Y.2d 1, 200 N.Y.S.2d 625, 167 N.E.2d 327, cert. denied, 364 U.S. 923, 81 S.Ct. 289, 5 L.Ed.2d 262 (1960). For the reasons specified and many others, long trials should be avoided. However, a multi-defendant stock fraud case, as involved as this one, usually necessitates delving into many financial transactions. Those who participate in such transactions do not supply the government with a simple and clear picture. The picture, even as on a jig-saw puzzle, only comes into vision by the assembling of hundreds of curiously shaped parts, each piece seemingly having no identity until it is fitted into and made a part of the whole. Every defendant can claim and with much plausibility that his own role may have become besmirched by having been tried with others more guilty than he—and naturally every defendant feels that he is the least guilty, if guilty at all.

 Two legal principles, however, must be honored. Those entrusted to make the laws have placed the crime of conspiracy on the books and it has not been repealed despite the fact that throughout the ages it has been largely responsible for multi-defendant trials and the admission of evidence otherwise

inadmissible. Nor does any statute exist nor are there court decisions which declare a trial of more than one defendant at a time to be reversible error.

In any financial scheme of magnitude involving many persons and many companies it is but normal expectancy that there be many participants. If the Government honestly believes (and there is no proof here to the contrary) that many defendants have played a part in the conspiracy they may be—and probably should be—joined as defendants. Again a long-established legal principal contributes to this joinder, namely, that a defendant need not be a member of the conspiracy from its inception to its termination. Defendant co-conspirators in many instances need not even know their fellow conspirators or the particular part they are playing. If the indictment of the many original defendants contributed to the length of the trial, this fact does not constitute reversible error.

### Colloquy

 Appellants argue that they were deprived of a fair trial because of the extensive colloquy engaged in between court and counsel. They point to certain statistics, inserted in the record by the court itself, that after over eight months of trial the 19,544-page transcript contained 9,814 pages of recorded testimony, 892 pages related to ancillary matters and 8,838 pages devoted to colloquy—practically 50 per cent testimony, 50 per cent colloquy. The trial was eventually to consume over eleven months and the transcript to extend over 26,000 pages.

 By definition, colloquy is mutual discourse. In any litigation, but particularly where many defendants and many counsel are assembled, colloquy is indeed mutual and can, unless controlled, become overly extensive. The Dardi brief contains a twenty-four page analysis of the subject matter of the more extended colloquies. Each topic was related to some point, substantive or procedural, which one or more counsel believed to be of importance to his cause. The trial court was undoubtedly mo-

tivated by a desire to obtain the correct answer and to give counsel the benefit of expressing their views. However, is the trial transcript the place to have recorded the extemporaneous legal philosophies of counsel, philosophies frequently tinged by the exigencies of the moment and the character of the testimony sought to be admitted or excluded? Would it not be better to insist that trial counsel insofar as possible be prepared to justify their positions in written memoranda submitted to the court? The myriad of legal points which could be conjured up by resourceful counsel, if debated on the record in a long and complicated case such as this, would result in a legal treatise not unlike a hypothetical *Corpus Juris Tertium*. Using the statistics submitted to us, since half of the record in eight months was devoted to matters other than testimony, the jury was subjected to four months of enforced attendance at a debating contest. This is not to say that on occasion a brief statement of the grounds for objection or the reasons for the admission or exclusion of evidence may not be helpful to court and opponent but the dictation by counsel on the record of treatises tantamount to Law Review articles should be avoided.

■ Except for unduly protracting the trial, and we have already determined that length *per se* does not create reversible error, the colloquy itself does not disclose material of a prejudicial nature. Furthermore, the blame, if blame there be, must be shared by the court and all counsel. But this is not to say that a tighter rein by the Judge would not have resulted in a materially shorter trial. We have already said that the court has wide discretion in adopting methods which will expedite a trial and that there are occasions when it is wise for this discretion to be exercised. See United States v. Agueci, supra, at 841 of 310 F.2d.

*The Trial Court's Charge*

1. Summation of "Contentions"

■ After an eleven months' trial, the trial court apparently believed that it would be of aid to the jury to summarize the facts. This summary occupied the first day of the two-day charge. Appellants attack the court's review of the parties' "contentions" as a distortion, more specifically, that they were not defendants' contentions but rather that "they were the prosecution's contentions of defense 'contentions.' " Only a careful analysis of the charge itself supplies the answer to the accusations that it was not impartial, that it was unfairly balanced, unfairly presented and unfairly emphasized or de-emphasized the positions of the defendants. To set forth any detailed refutation of these charges might well require a re-statement of the court's 450-page charge. Any such procedure would only add needlessly to the ever-expanding law reports. The conclusion from this court's analysis is that the charge was fair and that no reversible error can be attributed to the trial court's review of the facts or "contentions."

2. Legal Errors in Charge

■ In addition to the attack on the trial judge's summary of "contentions" in the charge, appellants assert that the charge incorrectly stated the law in various respects. While specific sentences as excised from the overall context may have been unfortunate, we think it clear that when viewed in its entirety, the charge correctly stated the law.

Appellants claim that the trial court's instructions on the issue of appellants' guilty knowledge and criminal intent as to the substantive counts was tantamount to directing the jury to bring in a guilty verdict. They stress particularly the statement that in proving that a defendant acted knowingly and wilfully it was not necessary for the defendant to know that he was breaking "any *particular* law or any *particular* rule" (emphasis added); that the jury might consider the amount of profits made on a certain transaction and whether appellants had a pecuniary or financial interest in the outcome of the transactions.

While these statements taken separately may seem misleading, we believe that this portion of the charge, read as a whole, adequately informed the jury of the government's obligation to prove guilty knowledge. The court said: "An act is wilful if it is done knowingly, deliberately and with an evil motive or purpose. * * * [t]he significant fact is the particular defendant's state of mind." In its context the statement that the defendants need not have known they were breaking "any particular law" signified that they must be shown to have known their actions were illegal even if they did not know exactly which statute they violated. The court then suggested criteria by which to evaluate the circumstantial evidence bearing on intent. Incriminating inferences, it suggested, might be drawn from documents which did not accurately depict the transactions they related to, from documents "made up, if you so find, to conceal what you regard as the actual facts in the transaction," from the use of dummy nominees and "of exchange checks to disguise the payment of money." Finally, in discussing the defendants' contention that they were protected by their reliance on legal opinions, the court charged that reliance on legal advice did not always constitute a complete defense; otherwise

> "regardless of the consciousness of wrongdoing on his part and perhaps on the part of his legal advisor, the advice of counsel would operate to confer immunity from punishment. Such is not the case.
>
> "However, if a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do, and if he fully and honestly lays the facts before his counsel and in good faith honestly follows that advice, relying upon it and believing it to be

correct, and only intends that his acts shall be legal, he could not be convicted of a crime which involves wilful and unlawful intent even if the legal advice that he received was erroneous.

> "But, on the other hand, no man can wilfully and knowingly violate the law and attempt to excuse himself from the consequences by arguing that he followed the advice of counsel."

Furthermore, this portion of the charge on requisite criminal intent[6] as to the substantive counts was supplemented by the statement made a few minutes earlier in the charge on the conspiracy count that "a knowing participation in a scheme having as an objective the knowing violation of the Securities Laws or the knowing violation of the Mail Fraud statute" was required.

The court properly instructed the jury that the Rule 133 "merger" exemption from the registration requirements did not apply to a subsequent resale of the stock acquired in the United Dye-Handridge merger. 17 C.F.R. § 230, 133; see United States v. Crosby, supra, at 939 of 294 F.2d; S. E. C. v. Culpepper, 270 F.2d 241, 247–48 (2d Cir. 1959). Appellants assert that the trial court erred in refusing to charge the jury that it might consider the extent to which the application of Rule 133 was unclear in 1956. However, it is at best doubtful that appellants were entitled to such a charge, since there was no evidence that they in fact had been misled by an incorrect analysis of this exemption. Indeed, the opinion letters relied on by Berman correctly advised that the stock was freely tradeable only if the seller were not a control person. In any event, the trial court did remind the jury of appellants' contention that

---

6. There is some dispute whether knowledge of illegality of sale need be shown to satisfy the "wilfulness" requirement of the Securities Act if the seller knew that the stock was control stock and that it was not registered. See Loss, Securities Regulation 1986, 1309 and Supp.1962 (discussing United States v. Crosby, supra). Since the charge was adequate on either view, we need not consider whether it gave the defendants an advantage to which they were not entitled.

"they acted on the advice of lawyers, that they were told that Rule 133 exempts the stock, that they didn't know that the stock had to be registered."

We have carefully considered the other contentions pertaining to legal errors in the charge and have found them to be without merit.

*General Unfairness and Admission of Prejudicial Evidence*

Dardi asserts that the trial court's rulings evidenced unconscious discrimination against defendants, the cumulative effect of which requires reversal; in the alternative, he points to various rulings which by themselves are said to require reversal. The innuendo that the trial court did not carry out its judicial obligations is completely unfounded.

1. Shawano and Bon Ami

■ Much of Dardi's criticism of the integrity of the trial can be attributed only to the nature of the conspiracy itself. For example, Dardi contends that admission of evidence concerning Bon Ami and Shawano Development Corporation resulted in prejudicial error requiring reversal. On direct examination, Guterma was allowed to tell of a prior conviction under the Securities laws involving both Bon Ami and Shawano stock. See United States v. Aronson, 319 F.2d 48, 51 (2d Cir.), cert. denied, 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164. Thereafter, transactions involving each corporation were put before the jury. Thus, Guterma testified that $150,000 of the $450,000 which Garfield and Pasternak transferred to United Dye in exchange for the release of the "pipeline" guarantee was channeled through Kent Window Corporation, a subsidiary of Shawano. Bon Ami was scrutinized more thoroughly. The liquid assets of Bon Ami were thus shown to have been used to satisfy the $519,000 Murchison obligation and to enable United Dye to repay the short-term debt incurred when Bon Ami was acquired. In each instance

the transaction was relevant to show the close relationship between Guterma, Garfield and Pasternak and the mechanics by which the major purpose of the conspiracy was effected. And, Dardi's cooperation with and proximity to the "executive" group during these dealings was "highly relevant to the issue of criminal intent and knowing complicity in the fraud and conspiracy." United States v. Crosby, supra, at 946 of 294 F.2d.

2. The Deputy Marshal Incident

■ Appellants urge that the trial court erred in denying a mistrial when a Deputy United States Marshal, assigned to escort Guterma during court appearances, engaged in a brief conversation with a juror. The trial court carefully investigated the incident, determined that the juror had not been influenced, and gave cautionary instructions. Under the circumstances, the court's denial of the motion for mistrial was not an abuse of discretion.

3. The Mayers Letter and Stock Purchasers' Testimony

■■ Appellants insist that there was error in allowing the jury to examine the "Mayers" letter, portions of which they characterize as anti-Semitic and vulgar. Since the offensive language did not refer to any of the appellants, it is difficult to see how prejudice resulted from this incident. Similarly, there is no merit in the contention that appellants were prejudiced by the testimony of the unfortunate purchasers of United Dye stock. Such testimony was relevant to numerous counts of the indictment.

4. Pleas of Guilty During the Trial

■ At the commencement of the trial, there were twelve individual defendants. After three weeks of trial, three pleaded guilty, including the defendant Garfield who had been closely associated with Guterma in the financial schemes under attack. Some three months later another defendant, Brann,

announced his intention to enter a guilty plea and subsequently became a Government witness. In July 1962 Pasternak, also prominently involved with Guterma, pleaded guilty. Other guilty pleas were entered in July and September. Although taken in the jury's absence, the jury could not have been unaware of these pleas. Appellants argue that under these circumstances a fair trial was impossible and that "The presumption of innocence could not have survived the parade of guilty pleas and the recitations." Dardi recognizes this court's decisions in United States v. Crosby, supra; United States v. Falcone, 109 F.2d 579 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); United States v. Rollnick, 91 F.2d 911 (2d Cir. 1937), but claims that the many guilty pleas from defendants tied in to the same conspiracy seriously prejudiced the remaining defendants.

Of course, in any multi-defendant trial, there is a real danger that the admission of guilt by one defendant, particularly in a conspiracy case or one in which the defendants have acted jointly, will react unfavorably against other defendants. However, no rule of law has yet been promulgated which forbids a defendant from so pleading during trial. This court, as have courts of appeals in other circuits, has faced this problem and has held in conformity with "the federal courts [which] have uniformly held it not error, if proper cautionary instructions are given, for the jury to be informed during trial that one or more defendants have pleaded guilty, or even for the jury to be present when the pleas are entered." United States v. Crosby, supra at 948 of 294 F.2d; see also United States v. Aronson, supra; United States v. Murray, 297 F.2d 812 (2d Cir.), cert. denied, 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962); United States v. Freeman, 302 F.2d 347 (2d Cir. 1962). The instructions given by the trial court after each plea, together with its comments on this subject in the charge, met the law's protective requirements.

## IV.

### SPECIFIC ERRORS

### *Restrictions on Lehrich's Cross-Examination*

 Dardi argues that the restrictions imposed upon the cross-examination of witness Lehrich was a denial of due process of law, and in the alternative, an abuse of discretion under the federal rule of the scope of cross-examination. Lehrich was an officer and director of United Dye and was Guterma's legal adviser. He was named as a co-conspirator, but was not a defendant. On its direct case, the Government called Lehrich to give testimony concerning what the parties have characterized as the "Bender" affair. Because of the limited scope of the direct examination, the trial court refused to permit defense counsel to cross-examine on the events of 1955 and 1956.

The trial court was justified in the exercise of its discretion in limiting cross-examination to the scope of the direct. United States v. Minuse, 142 F.2d 388, 389 (2d Cir.), cert. denied, 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576 (1944). Moreover, during Lehrich's cross-examination (cross-examination by Dardi's counsel covers some 250 pages of transcript), the court gave defense counsel "widest latitude to impeach Lehrich on such matters as bias, interest, hostility, special relationship to the government, and motivation to falsify, * * *" Cf. United States v. Bentvena, supra, at 940–41 of 319 F.2d. In any event, the trial court advised counsel that if Lehrich was called as part of the defense case, he could be examined on the events of 1955 and 1956 as a hostile witness. Having failed to avail himself of this opportunity, Dardi cannot now complain.

### *The "Bender" Affair*

 To show Dardi's "consciousness of guilt," the Government adduced testimony involving an attempt to quash a SEC investigation of United Dye through

the intercession of former Senator George Bender, then Special Assistant to the Secretary of the Interior. Dardi argues that there was a failure of proof in regard to the "Bender" episode which resulted in substantial prejudice.

The "Bender" affair was alluded to first in the Government's opening and was developed in more detail during Guterma's direct examination. While Guterma's testimony on this matter was restricted to Dardi, the only participant remaining in the case, he was completely exonerated by Guterma's account, and the jury was thoroughly instructed to that effect. Thereafter, Lehrich testified in substance that he had told Dardi of a conversation he had had with Garfield in which Garfield had spoken of a commitment for $100,000 which he (Garfield) had with Bender; that Guterma was obligated for $30,000 of the commitment and Dardi for $20,000; that Garfield would like them to meet their obligations; that Dardi said that he had made such a commitment but was out of funds at the moment but that he would talk to Garfield about it. Lehrich then told of a previous conversation in which Garfield had said that Bender might be helpful in connection with a pending SEC investigation; that Garfield said that he told Dardi, Guterma and Eveleigh of his projected trip to Washington to see Bender and that he had seen Bender.

There was no failure of proof. Lehrich's testimony, if believed, might well have been sufficient to have implicated Dardi. And in view of the trial court's adequate and specific direction to the jury that the Bender episode was being offered only as to Dardi, the conclusory claims of prejudice by the other appellants are without merit.

*The Prosecutor's Comments on Summation as to Cumulative Testimony*

■■ Error is asserted in the court's refusal to grant Dardi's motion for a mistrial because of the prosecutor's statement in summation that Lehrich and Eveleigh if called would have testified cumulatively to Guterma. Apparent-

ly the prosecutor felt piqued to make this comment because of references in the summation of defense counsel to the failure of the prosecution to call them as witnesses. Counsel for the prosecution and the defense definitely should not put forward their own views as to the possible testimony of witnesses not called or tell the jury their own reasons for not calling them. However, here the jury had adequate affirmative testimony to support its verdicts and the prosecutor's comments under the circumstances do not constitute reversible error.

*Berman's Inspection of Prior Testimony*

■ Upon Berman's cross-examination, the Government read various questions and answers from Berman's prior testimony to the SEC and the Stock Frauds Unit of the office of the Attorney General of New York. While counsel was permitted to examine each question and answer, the court did not allow counsel to read the transcripts as a whole or those portions surrounding the questions and answers alluded to. At the completion of cross-examination, the court took it upon itself to read both transcripts "for the purpose of finding out whether there is any material or relevant qualifying or explanatory context of the questions and answers * * * used."

In United States v. Stone, 282 F.2d 547, 552 (2d Cir.), cert. denied, 364 U.S. 928, 81 S.Ct. 353, 5 L.Ed.2d 266 (1960), this Court affirmed the proposition that "when the prosecution uses testimony of a defendant before the grand jury, the defendant must be allowed to inspect it." See United States v. Cotter, 60 F.2d 689 (2 Cir.), cert. denied, 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932). In Stone, where the court did not examine the transcript, this Court on appeal reversed the conviction on one count since it was not certain that the grand jury transcript which this Court had examined would not have been "far more effective than what the trial jury may well have regarded as an invented and self-serving explanation [of the inconsistency]." In Cotter, however, the trial court did read the tran-

script; and, because appellants there "chose to rest upon the bare denial of their right" and had shown no prejudice, the convictions were affirmed.

Here, as in Cotter, there is no showing of prejudice. Berman eventually did obtain a copy of his SEC testimony, although from a source other than the trial court or prosecutor, in such time that he might have used it had he so desired. As to the Attorney General's transcript, it appears from the record that Berman abandoned his requests to examine it personally. He was not entitled to the full transcript until the Government used it on cross-examination. See United States v. Murray, supra, at 821 of 297 F. 2d. When the request was first timely made, after cross-examination, the trial court suggested that Berman raise the matter again. Although Berman thereafter pressed for the SEC material, no further demand was made for the Attorney General's transcript. Berman expressed his appreciation to the trial court for undertaking to read the transcript, but did not inquire later as to what the trial court's reading had disclosed. Under these circumstances, it is clear that Berman seeks to take advantage of circumstances which arose due to his own inaction. His claim does not merit reversal of his conviction.

*Assignment of Counsel for Rosenthal*

 Rosenthal argues that the trial court's failure to adjourn the trial because of his counsel's illness, and its subsequent assignment of a co-defendant's counsel requires reversal. Examination of the events surrounding Rosenthal's original counsel's disability, his unsuccessful efforts to secure another counsel willing to proceed without an inordinate continuance and the arrangements finally made lead to the conclusion that the trial court's treatment of the matter was entirely reasonable under the circumstances, and that Rosenthal suffered no prejudice. Rosenthal had a month's notice that his lawyer's health was questionable. His original counsel was available for consultation with his replace-

ment. His defense had not been unduly complicated. The trial court, therefore, properly refused the continuance of "at least a month and a half to two months" requested by the lawyer Rosenthal selected. Rosenthal was unable to make satisfactory financial arrangements with other counsel; consequently, the court appointed the counsel of another defendant, Cornelius DeVroedt, Inc., who had also represented the individual defendant DeVroedt prior to his severance due to illness. Rosenthal, Cornelius DeVroedt and the DeVroedt Corporation were charged with "substantially the same acts," and the court specifically found that the assignment would not give rise to a conflict of interests, but indicated that if a conflict were to arise, the appropriate precautions would be taken.

 While the right to counsel is absolute, its exercise must be "subject to the necessities of sound judicial administration." United States v. Arlen, 252 F.2d 491, 494 (2d Cir. 1958); and where there appears to be no conflict, the court may, in its discretion, assign to a defendant the attorney of a co-defendant. See, e. g., Danziger v. United States, 161 F.2d 299, 301 (9th Cir.), cert. denied, 332 U.S. 769, 68 S.Ct. 81, 92 L.Ed. 354 (1947). Such an assignment is not, in itself, a denial of effective assistance of counsel. Since Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), it has been clear that some conflict of interest must be shown before an appellant can successfully claim that representation by an attorney also engaged by another defendant deprived him of his right to counsel. See United States v. Bentvena, supra at 937 of 319 F.2d and cases there cited. During the Government's direct examination of Barkley, there arose the possibility that a conflict of interest might occur during cross-examination. At that point Cornelius DeVroedt, Inc. entered a plea of *nolo contendere* and was severed, thus removing any possible conflict.

 Rosenthal makes the further argument that the trial court improperly denied his request to put a series of "ex-

culpatory" questions to a former salesman who had invoked the Fifth Amendment. This argument proceeds on an erroneous notion of evidence that may be submitted for the jury's consideration. An attempt to influence the jurors in the manner suggested was correctly rejected by the trial court.

### Impeachment of Witness McCollom

 McCollom was a defense witness called to rebut Brann's testimony. He testified that Brann's reputation in Geneva, Switzerland, for truth and veracity was "just as poor as it could possibly be." On cross-examination, the prosecution asked McCollom whether or not there was a warrant of arrest outstanding against him in Switzerland for embezzlement of $50,000. Apparently, the Government sought to show that McCollom was motivated to lie about Brann because Brann had been responsible for bringing the embezzlement charges. However, McCollom denied that an arrest warrant existed and the Government was prevented from pursuing the inquiry. Dardi relies on Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L. Ed. 168 (1947) in urging that the Government's inquiry requires reversal. That case, however, concerned the use of evidence of a prior conviction after the defendant had placed his character in issue. Here, the question was aimed at impeaching a witness' credibility by showing his hostility and bias. While an arrest alone is not normally admissible to impair the credibility of a witness, the fact that it might have embittered him so as to motivate him to testify as he has may be relevant. In any event, the incident complained of, when viewed in context, was not so prejudicial as to require reversal.

### Timm's Appearance Before the Grand Jury During the Trial

 Reversible error is attributed to the prosecutor's acts in calling Alexander Timm, Dardi's former personal secretary and an officer and director of United Dye, before the Grand Jury. The reason advanced by the prosecutor for this action was that Timm's testimony was relevant to a possible conspiracy to obstruct justice. Dardi in turn claims that the prosecutor was only using this reason as a subterfuge to gather valuable evidence and to put pressure on Timm so as to obtain information and leads for use on the trial.

The merits of these conflicting contentions were carefully considered by the trial court in a seven-page opinion dictated into the record, denying a defense motion for a mistrial and the suppression of evidence. The trial court read Timm's Grand Jury testimony, properly recognized the principle of law that "It is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial" and came to the conclusion that under the particular facts before it (no useful purpose will be served by outlining the Government's futile subpoena efforts) "the Grand Jury's inquiry into a possible conspiracy to obstruct justice was conceived and carried out in good faith and in a manner that did not prejudice the complaining defendant," and that Timm's Grand Jury subpoena did not constitute "the use of a Grand Jury as a subterfuge to elicit testimony for use at this trial." Under all the circumstances, this conclusion must be sustained.

The jury had full opportunity to hear the explanations advanced by capable counsel during most extensive summations in complete exculpation for appellants' every act. The four days required by the jury to reach their verdicts scarcely bespeak a snap judgment. In final analysis, the resolution of the facts and the inferences to be drawn therefrom were for jury decision. After consideration of all the many assertions of error, none of the points, individually or collectively, demonstrate that the defendants were deprived of a fair trial.

Judgments affirmed.