**UNITED STATES of America,
Appellee,**

v.

**Saul I. BIRNBAUM, Appellant.**

**No. 88, Docket 30511.**

United States Court of Appeals
Second Circuit.

Argued Oct. 25, 1966.

Decided Feb. 10, 1967.

David W. Peck, New York City (Ben Herzberg, Howard T. Milman, Frederick F. Greenman, Jr., Hays, Sklar & Herzberg, New York City, of counsel), for appellant.

Peter E. Fleming, Jr., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Douglas S. Liebhafsky, Michael W. Mitchell, Asst. U. S. Attys., of counsel), for appellee.

Before LUMBARD, Chief Judge, and MOORE and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This Court is no stranger to this case. In September 1963, Saul I. Birnbaum was convicted by a jury of bribing and conspiring to bribe an Internal Revenue Agent. On appeal we reversed his conviction and ordered a new trial. On remand, a jury for the second time found the appellant guilty. Birnbaum now urges us to reverse this second conviction, claiming that the judge's charge to the jury was prejudicial and that certain evidence was improperly admitted.

The indictment, filed on November 3, 1961, contained four Counts. The first charged that Birnbaum, a certified public accountant, and Harold Simon, an Internal Revenue Agent, had conspired with Alexander L. Guterma, Robert J. Eveleigh, and Robert C. Leonhardt, to violate various sections of the Criminal and Internal Revenue Codes dealing with bribery.[1] Guterma, Eveleigh and Leon-

1. The count referred to 18 U.S.C. § 201 (offer to officer), 18 U.S.C. § 202 (acceptance or solicitation of officer), and 26 U.S.C. § 7214 (unlawful acts of revenue

hardt were named as co-conspirators but not defendants.

Counts Two and Four named Simon alone, and charged him with violating 26 U.S.C. § 7214(a) (2) by accepting a bribe in return for a favorable determination regarding the tax returns of Guterma and Leonhardt. The third Count asserted that Birnbaum only had violated 18 U.S.C. §§ 2 and 201 by giving cash and securities to Simon for the purpose of influencing his determinations.

Simon pleaded guilty to Counts One, Two and Four, and was sentenced to 18 months' imprisonment on each of the latter two Counts, and a year and a day on the first Count, the sentences to run concurrently. He was also fined $2000 on Count Four.

Birnbaum entered a plea of not guilty, and in September 1963 he was tried before Judge Thomas J. Murphy and a jury. Found guilty on both Counts in which he was named, Birnbaum was sentenced to 18 months' imprisonment on each, the sentences to run concurrently. On appeal, however, we reversed his conviction and remanded the case for a new trial, principally because of the erroneous admission of certain evidence. United States v. Birnbaum, 337 F.2d 490 (2d Cir. 1964).

Birnbaum's second trial commenced in February 1966 before Judge Irving Ben Cooper and a jury. The prime issue was whether Birnbaum was implicated in the bribery of Simon, and once again a verdict of guilty on both Counts was returned. Judge Cooper imposed a sentence of one year on each Count, the terms to run concurrently. It is from this judgment that the present appeal is taken.

## I.

■ It is not possible to explore adequately Birnbaum's numerous claims of error without a thorough understanding of the complicated transactions underlying the alleged bribery of Simon. In summarizing the voluminous evidence presented to the jury, we are mindful of the well established principle that "[o]n appeal the evidence must be considered in a light most favorable to the Government." United States v. Dardi, 330 F.2d 316, 325 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); United States v. Kelly, 349 F.2d 720, 730 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). The government relied primarily on the testimony of co-conspirators Guterma, Eveleigh and Leonhardt. From their testimony and other evidence adduced at the trial, the jury was entitled to find the following facts.

### The Wickersham Transaction

Saul Birnbaum, a certified public accountant and a partner in Birnbaum & Birnbaum, became acquainted with Robert Leonhardt in 1951, and Birnbaum's accounting firm served thereafter as Leonhardt's personal accountant until 1956.

In 1953, Leonhardt and Alexander Guterma formed an over-the-counter brokerage firm known as the McGrath Securities Corporation (McGrath), and Birnbaum's firm served as its accountant until 1956. Although Birnbaum knew Guterma, at no time did he serve as his personal accountant.

Birnbaum was also acquainted with Philip Shaiman, Albert Hayutin, and Marvin Hayutin, and in 1954 he became a principal owner with them of 1840 Lincoln Road Corporation (Lincoln),[2] a

officer). This appeal does not concern itself with an interpretation of those sections.

2. There is apparently some confusion as to the exact name of this corporation. During his direct examination Guterma referred to it as the 1840 Lincoln Road Corporation, and appellant's brief uses that designation. When Birnbaum was cross-examined, however, the prosecutor referred to the corporation as 1840 Lincoln Street. Reference to "Street" instead of "Road" is also to be found in the Government's brief. It is clear, however, that all parties are referring to the same corporation and we have referred to it as "Road."

Denver enterprise which held real estate and was engaged in acquiring uranium claims in the Far West. The Denver group desired to sell its securities to the public and it was in this connection that in late 1954 Birnbaum put Marvin Hayutin in communication with Guterma. After exploring the situation, Guterma approved the idea of merging Lincoln with an existing public corporation, and he recommended the Shawano Development Corporation (Shawano), of which he was president and the controlling stockholder, as the ideal company with which to merge. Shawano shares were already being traded in a wide market, and Guterma was eager to sell its shares to the public.

In January 1955, at a conference held in Denver, Guterma proposed to Birnbaum and the other owners of Lincoln that the Denver-based enterprise change its name to the Paul Revere Uranium Corporation (Revere), and that Guterma or his nominee purchase a 40% interest in Revere for $30,000. Thereafter, Revere would exchange its assets for 550,000 shares of Shawano stock and would dissolve. Guterma or his nominee would receive approximately 200,000 shares of Shawano, while Birnbaum and his associates would divide the remaining shares in proportion to their respective holdings in Revere. Following these transactions, the parties would cooperate in selling their Shawano shares to the public.

Rather than purchase a 40% interest in Revere directly, Guterma decided to exercise his option to buy its stock through a nominee. Upon returning to New York from the Denver meeting, he informed Leonhardt of the details of the proposed Shawano-Revere merger, and proposed to "sell" Leonhardt the stock of the Wickersham Corporation (Wickersham), a dormant Panamanian company owned entirely by Guterma, in ex-

change for Leonhardt's personal notes for $295,000,[3] which would be secured only by the Wickersham stock so "purchased." Under the terms of the "sale," Wickersham was to purchase the 40% interest in Revere to which Guterma had the option. The profits that Wickersham would eventually realize by virtue of the merger and dissolution of Revere and the sale of the Shawano shares to the public through McGrath, would go to Guterma, with Leonhardt receiving about one-quarter as his share.

To summarize these complex transactions, it appears that the essence of the plan was that (1) Leonhardt would purchase Wickersham from Guterma, financing the purchase by his personal notes secured only by the Wickersham stock itself; (2) Leonhardt would cause Wickersham to purchase 40% of Revere's stock for a price of $30,000; (3) Revere would then exchange its assets for 550,000 shares of Shawano stock and dissolve; (4) upon dissolution of Revere 200,000 Shawano shares would be distributed to Wickersham, whose sole shareholder, Leonhardt, would sell them to the public and divide the profits with Guterma; and (5) the remaining 350,000 shares would be divided among Birnbaum and his associates who would also sell them to the public and retain the proceeds.

The plan, master-minded by Guterma, was carried out with precision. The eventual sale to the public of the Shawano stock brought Birnbaum approximately $190,000 in profits, while Wickersham derived a profit of $397,000. As Wickersham received cash from the sales of its Shawano shares, Leonhardt caused the corporation to "loan" these proceeds to Guterma in three installments, taking back Guterma's personal notes which then became Wickersham's only assets. Guterma in turn "loaned" Leonhardt $102,000, representing the latter's share of the profits.

3. Actually, Leonhardt gave Guterma two notes totaling $320,000. The amount of the "debt" was reduced to $295,000 after Wickersham sold its Shawano stock in the spring of 1955. Leonhardt then wrote a letter to Guterma, antedated to February 10, 1955, to reflect that $295,000 was the original "purchase price" of Wickersham.

Ten months after Leonhardt's acquisition of Wickersham, the corporation was dissolved and its assets distributed to him. The ambagious transactions between Leonhardt and Guterma were finally concluded in August 1956 when Leonhardt gave Guterma two checks, one for $102,000 to repay Guterma's "loan" made in June 1955, and the second for $295,000 to pay off the notes with which Leonhardt had "purchased" Wickersham in February 1955. At the same time, Guterma repaid Leonhardt the $397,000 which Wickersham had "loaned" him after the sale of its Shawano stock to the public.

### The Bribery of Simon

We now return to the core of the charges. When the proposed Wickersham transaction was outlined to Leonhardt in February 1955, Guterma assured him that his share of the profits could be treated as long-term capital gain, provided Leonhardt held his Wickersham stock for at least six months after "purchasing" it. Leonhardt then consulted his accountant Birnbaum about the proposed Wickersham transaction, and specifically sought instructions as to the form the deal should assume so that his profits would receive capital gains treatment.

Leonhardt's personal tax return for 1955, prepared by Birnbaum's firm, reported that his profits on the Wickersham deal were realized in December 1955 when the corporation was formally liquidated. Since Leonhardt purchased the Wickersham stock in February 1955, some ten months before, he reported the profits as long-term capital gains. The government urges, however, that Leonhardt's profit of $102,000 was actually in his hands in June 1955 when Guterma "loaned" him that sum, and therefore he realized the profit at a time less than six months after his "purchase" of the Wickersham stock. Thus, the government reasons, there existed serious doubts as to whether the treatment of Leonhardt's profits as capital gains would have passed muster by a Revenue Agent examining the returns, and there always was extant a good reason to attempt to bribe the agent reviewing the returns.

In the fall of 1956, Leonhardt received a telephone call from Revenue Agent Harold Simon who had been assigned to audit McGrath's 1955 return. The two men met in January 1957 and Leonhardt told Simon to speak to Birnbaum, his accountant. After meeting with Simon, Birnbaum reported to Leonhardt that he "had nothing to worry about because * * * he had had lots of dealings with internal revenue agents and he knew which ones of them could be taken care of and this was one." Simon subsequently requested that he be assigned to audit Leonhardt's personal income tax returns for 1954 and 1955.

In April, Birnbaum reported to Leonhardt that the Wickersham transaction "was being looked at as straight income" but that treatment of the Wickersham profits as long-term capital gains could be assured by paying Simon $5,000. Birnbaum also informed Leonhardt that Guterma was being brought into the matter so that Birnbaum would "get his money from Guterma to take care of this Treasury Agent" and Leonhardt would only have to make "a token payment." A meeting was subsequently held between Guterma, Birnbaum and Simon in which Eveleigh later joined and after considerable bickering Guterma agreed to pay Simon $10,000 and give him 5000 shares of Shawano, but only if Simon succeeded in obtaining Guterma's 1955 return for audit, so that it could be coordinated with Leonhardt's treatment of the Wickersham profits. Eveleigh, Guterma's right hand man, testified that about ten days later Simon was paid at Guterma's office, but that at Birnbaum's request the actual payment was not made until he left the office because Birnbaum said, "I don't want to be present when this takes place." [4]

4. Although reluctant to be present when the actual payment occurred, Birnbaum apparently showed no hesitation in requesting compensation for his services.

Simon, however, was apparently not satisfied with the agreement the conspirators had reached, and in the summer of 1957 Birnbaum informed Leonhardt that he was going to have to pay Simon $25,000. Leonhardt balked, but finally agreed to pay $10,000 and an additional $5,000 or $6,000 when he could afford it. In September 1957, Leonhardt delivered $10,000 in cash to Birnbaum in the latter's office to give to Simon. Leonhardt, however, failed to make any additional payments. Another meeting occurred in April 1958, at which time Birnbaum, in Simon's presence, told Leonhardt that he was tired of his failure to pay, and that any future payments should be made directly to Simon. Thereafter, Simon continued to press Leonhardt for the money he owed, but these efforts were without success.

### The Leonhardt-Birnbaum Tape

In July 1961, some four years after he had given Birnbaum $10,000 to give Simon, Leonhardt reported the bribery to the Federal Bureau of Investigation. Acting in cooperation with the authorities, Leonhardt met with Simon on September 13, 1961 and informed him that he would be unable to make any further payments. Following this meeting, and again acting under FBI supervision, Leonhardt, armed with a concealed tape recorder, met with Birnbaum at the latter's office and recorded their conversation.[5] Finally, on October 9, FBI agents hidden in Leonhardt's apartment recorded on film the receipt by Simon of $1250 in marked bills from Leonhardt. Simon was arrested as he left the apartment shortly thereafter.

### II.

With this recital of the underlying entangled facts, we may now approach the fundamental task of assessing Birnbaum's numerous allegations of prejudicial error. In order to place this appeal in proper perspective, we note at the very outset that although Birnbaum devoted a major portion of his brief and oral argument to attacking the prosecution's case against him, he does not claim that the evidence was insufficient to sustain the jury's verdict. Rather, asserting that since the "closeness" of the factual issues bears directly on the magnitude of error required for reversal, he attempts to demonstrate that the present case was actually a very close one and thus only a minimal amount of error was necessary to prejudice the jury against him. The record, however, fails to support this contention. Indeed, our dissenting brother believes the evidence of guilt was "overwhelming."

In assessing the alleged closeness of the case, we must view, as the jury did, the entire mosaic of evidence. We should avoid becoming over-absorbed with each tessera. See United States v. White, 124 F.2d 181, 185 (2d Cir. 1941). From the testimony of Guterma, Leonhardt and Eveleigh, there emerges clear and overwhelming proof of Birnbaum's complicity, which the jury was, of course, free to accept.

Although appellant has argued at great length that he lacked any motive to bribe Simon we recall that Leonhardt testified that Birnbaum had advised him as to the form the Wickersham transaction should take so that Leonhardt's profits would be recognized as long-term capital gains instead of ordinary income. Birnbaum may well have been troubled by the advice he had given when serious questions were later raised as to the correctness of his recommendations.

Moreover, it is undisputed that Birnbaum derived a profit of nearly $200,000

---

Guterma testified that in the fall of 1957 Birnbaum asked for $5,000 for the assistance he had rendered Simon in co-ordinating Leonhardt's and Guterma's treatment of the Wickersham transaction in their tax returns. Guterma finally agreed to give Birnbaum 5,000 shares of the Micro-Moisture Corporation, worth about $2,500.

5. A transcript of this conversation was introduced at the second trial by Birnbaum. The conversation will be discussed in more detail in a subsequent portion of this opinion.

from the Wickersham deal, and it is suggested with some merit that he wished to avoid an SEC investigation that would link him to Guterma and his associates—a distinct possibility if the details of the Wickersham transaction were exposed during a thoroughgoing Internal Revenue audit of Leonhardt's return. Thus, it was to Birnbaum's personal advantage to be certain that Leonhardt's 1955 tax return was approved without any challenge or contest. In these circumstances, we see little merit to appellant's contention that the jury could not have found any motivation for Birnbaum's participation in the Simon bribery.

Birnbaum also attempts to demonstrate the alleged weakness of the government's case by attacking on appeal the credibility of the prosecution's witnesses. He points to the unsavory backgrounds of Guterma, Leonhardt and Eveleigh, and speculates as to their possible motives for implicating him in the bribery. But all of these arguments were forcefully presented to the jury by Birnbaum's counsel. Moreover, Birnbaum testified in his own behalf and vigorously denied the accusations of the government's witnesses. In addition, the prosecution's witnesses were subjected to rigorous and extensive cross-examination by Birnbaum's exceptionally competent counsel;[6] nearly one-third of the defense's summation to the jury was devoted to attacking the credibility of Guterma, Leonhardt and Eveleigh, with such choice epithets as "unmitigated scoundrels," "greedy," "defrauders," "indicted perjurers," and "the biggest swindlers of the twentieth century." Birnbaum stressed to the jury that these three culprits were the only ones connecting him with the bribery charge, and that it was "incredible that anyone would believe their word * * * in light of the meaninglessness of the oath to them."[7] But the art of advocacy apparently failed to overcome the impression made by the prosecution's witnesses whose stories were subjected to the test still accepted as best calculated to reveal the truth. And, *not once, but twice*, did a jury choose to believe Guterma, Leonhardt and Eveleigh, to disbelieve Birnbaum, and to conclude beyond a reasonable doubt that Birnbaum was guilty of a serious crime.

In essence, appellant's argument is premised on the assumption that when the government's witnesses are men of questionable character, as often they must be, its case is inherently weak. There is, of course, no such principle of law. In bribery cases, just as in prosecutions for selling narcotics, the nature of the crime compels the government, more often than not, to rely heavily on the testimony of unsavory accomplices or informers. The Supreme Court recently commented on this, noting that "it does not follow that * * * [the informer's] testimony was untrue * * *. The established safeguards of the Anglo-American legal system leave the veracity of the witness to be tested by cross-examination". Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 418, 17 L.Ed. 2d 374 (December 12, 1966).

In long[8] and hard-fought cases such as the present one, an appellate court must be careful lest, in the words of Mr. Justice Frankfurter, "the perspective of the living trial is lost in the search for error in a dead record." Glasser v. United States, 315 U.S. 60, 88, 62

---

6. Guterma's direct examination consumed 100 pages of the record, while his cross-examination is recorded in 171 pages. Eveleigh's direct examination was 35 pages, while his cross-examinations consumed 83 pages. Leonhardt died before the second trial, and his testimony from the first trial was read to the jury.

7. The solemnity of the oath seems to have been somewhat meaningless to Birnbaum.

At the first trial appellant denied having any conversation about Guterma's interest in the Paul Revere-Shawano merger, but at the second trial he admitted discussing the merger with both Guterma and Leonhardt. He also admitted discussing the Wickersham deal with Leonhardt although at the first trial he had denied having any discussion.

8. The trial lasted 12 court days.

S.Ct. 457, 473, 86 L.Ed. 680 (1942) (Frankfurter, J., dissenting). Our legal system leaves the awesome question of guilt for the jury, with the prosecution assuming the proportionately difficult burden of persuading a jury of twelve that the defendant is guilty beyond a reasonable doubt. When, as in the present case, the evidence is sufficient to warrant submission to the trial jury, we must take care not to sit as a "super jury" reevaluating credibility or reweighing the evidence. See, e. g., United States v. Kelly, supra; United States v. Dardi, supra; United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). In cases where there is enough evidence to go to the jury, our main task is to determine whether there were errors by the court of sufficient prejudice to the defendant to justify vitiating the jury's verdict. It is to that task which we now turn, bearing in mind that we are not confronted with one of those rare cases which, because of deficiencies in proof, requires reversal if but the slightest error is found.

### III.

■ Every criminal case imposes special responsibilities on the trial judge, especially when the evidence is sharply controverted and the prosecution must rely on witnesses who admit their own guilt. The charge to the jury is one of the most difficult and important tasks performed by the judge, since the jurors must be correctly apprised of the relevant law in order that they can reach a proper verdict. Because of this, long hours are spent preparing the charge so that it will convey the law in terms well within the comprehension of a jury, while at the same time avoiding any suggestion that the judge favors one side over the other.

Despite the pains that are taken in the drafting of a precise and just charge, often misstatements creep into the jury's instructions; also, on occasion, the judge, absorbed in the trial, will inadvertently do something which will be interpreted as espousing a view on the case. But, as we have noted, "[a]bsolute perfection in trials will not be attained so long as human beings conduct them * * *." United States v. Kahaner, supra at 485. The relevant inquiry for an appellate court, therefore, is not whether the trial was free from errors, but rather whether it was free from *prejudicial* errors. See Rule 52(a), Federal Rules of Civil Procedure.

■ In determining whether a judge's charge has exceeded the bounds of propriety, a multitude of factors must be considered. The length of the charge, for instance, must be judged by the complexity of the factual and legal issues involved in the case, and the fashion in which counsel presented them to the jury. The trial judge is best suited to determine how detailed his charge must be in order that the jury derive the maximum benefit. Therefore, an appellate court should not decide that a charge is defective by a mere count of the pages in the record. And it seems to us to be a rather strait-jacketed approach to conclude that a charge was excessively long by use of the rubric which suggests that two different trials before two different judges should proceed in exactly the same manner any more than that the same prosecutor or defense counsel must proceed in the second trial exactly as he did in the first. Multiple trials cannot be conducted identically and the length of each might well vary. Thus, for example, in Birnbaum's first trial, the Leonhardt-Birnbaum tape was not in evidence, and therefore did not have to be considered by Judge Murphy in his charge.

■ In evaluating the instructions to the jury, not only must each statement made by the judge be examined in light of the entire charge, but the charge itself can only be viewed as part of the total trial. Often isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial. Moreover, a juror's perception of the judge's attitude con-

cerning the case, assuming he has displayed one, will be influenced not only by what the judge says in his charge, but also by how the judge conducted himself from the outset of the trial.

It is interesting to note that Birnbaum makes no claim that his trial in chief was not fair or that the court failed to preserve an atmosphere of impartiality. There is no allegation that Judge Cooper was discourteous or hostile to Birnbaum or his counsel, or attempted to take over or bolster the government's presentation or to undermine the defendant's case. Nor is he charged with conduct which was designed to restrict Birnbaum's right to cross-examine the prosecution's witnesses [9] or to present fully his own case.[10] Rather the record reveals that the judge made overt efforts to be fair to the appellant. This is evidenced by the great pains he took at the inception of the trial to be certain that the selected jurors had not prejudged the case,[11] in his constant reminders to the jury of the importance of its task,[12] and in his admonitions that the government's version was not to be preferred over the defendant's.[13]

Moreover, Judge Cooper did not hesitate to exercise his discretion in Birnbaum's favor in order to be sure that he received a fair trial. Thus, for example, despite the fact that on the first appeal this Court had specifically approved of the showing at the earlier trial of the October 9, 1961 payment to Simon as recorded on film, Judge Cooper refused to allow the film to be viewed by the jury on the ground that its probative value might be over-balanced by the possible resultant prejudice. And in his charge, Judge Cooper erroneously instructed the jury in appellant's favor by stating that the prosecution must meet "a comparatively enormous degree of proof * * * to find him [Birnbaum] guilty beyond a reasonable doubt * * *." This is not the language of a venal "hanging judge," bent on conviction.

■ Finally, it should be noted that even after the jury had deliberated at

9. As we have already noted, the cross-examination of the government's witnesses took substantially longer than their direct examination. See note 6, supra.

10. As defense counsel noted in summation, "The Court was very generous in the allowance of time to me."

11. Judge Cooper's questioning of the jurors occupies nearly 80 pages of the record, and in fact, in the interest of assuring appellant an impartial jury, a number of jurors were dismissed on the judge's direction and without the use of a peremptory challenge.

12. At the very outset of the trial, for example, Judge Cooper impressed the jurors with their responsibility:

You are called a minister of justice. What does that encompass? It is just sitting as wooden Indians? Is it to toss a coin to decide whether or not a person is guilty? Is it just to rush through at any and all costs the myriad of detail which make up a trial?

Now, it is a dedication, letter and spirit, to the doing of justice. Nothing short of that will do, or there is no justice.

You and I and the community have a stake in justice, for as it goes in the courtroom, so pretty much goes it in the community.

The doing of justice is difficult. Everything in life worthwhile is difficult, whether giving birth to a child or meeting the exact moment of death.

I repeat, nothing that is sacred, as justice is sacred, comes easy.

Your mission is saturated with responsibility.

13. "Who is right under the facts and on the law, which side? I mentioned that the government has the burden of proving the guilt of the defendant beyond a reasonable doubt, but I don't want to be misunderstood with regard to the part that the government plays in this case. The government is a party to this litigation. On one side you have the government. On the other side you have the defendant, and under our law—and this is something to contemplate—the mighty U.S.A. when it comes into a court is just another party to the litigation and has no greater standing than the other party to that litigation, but, of course, no less consideration, because we are concerned here with equal justice under the law, justice to the plaintiff and justice to the defendant. All parties stand equal in the eyes of the law, the government, the defendant * * *."

some length, Judge Cooper did not hasten to deliver the so-called *Allen* charge,[14] but indeed refrained from utilizing this controversial but, nevertheless, proper admonition to the jury which defendants generally abhor.

▮ In sum, the trial transcript strongly suggests that Judge Cooper made every effort to be fair and courteous to both Birnbaum and the government. The record fails to reveal any pattern of partiality toward one side and hostility toward the other that might be said to have contaminated the free air of an impartial tribunal.

## IV.

### The Charge

With the charge properly set in the framework of the trial, we proceed to consider the primary allegations of prejudicial error raised by Birnbaum.

*The 1961 Payment to Simon*

▮ It will be recalled that in October 1961, Leonhardt paid Simon $1250 in marked bills, while agents of the Federal Bureau of Investigation recorded the incident on film. Birnbaum contends that he had no connection with this act of bribery since concededly he was not present when the payment occurred. Moreover, Birnbaum argues that even if a conspiracy involving him had existed, it had terminated by October 1961.

Similar contentions were raised by Birnbaum in his first appeal and were rejected by this Court:

The passing of money to Simon may have had some probative value relating to the existence of the original bribe arrangement. * * * [W]ithin the narrow range set forth in Lutwak [Lutwak v. United States, 344 U.S. 604, 73

S.Ct. 481, 97 L.Ed. 593 (1953)], the money passing was admissible.

* * * The trial judge in balancing the probative value of the evidence against its possibly prejudicial effect is vested with broad discretion. [337 F.2d at 496.]

We see no reason to overrule our prior holding.

Appellant claims that he was prejudiced by Judge Cooper's several references in his charge to the 1961 incident. While we are of the view that the charge would not have suffered had fewer references been made to the incident, we are unable to conclude that any prejudice resulted. Cf. United States v. Kelly, supra, 349 F.2d at 765–766; United States v. Kahaner, supra, 317 F.2d at 478. The judge, we believe, clearly indicated the limited purpose for which the 1961 incident was to be considered. He instructed the jury:

In determining whether there existed a conspiracy as charged, you may consider the passage of money between Leonhardt and Simon in October of 1961, a fact stipulated by both sides.

What explains this passage of money? Note carefully that as a matter of law you may not consider the passing of the money in 1961 between Leonhardt and Simon as any evidence of defendant's membership at any time in the conspiracy as charged, should you find it to have been formed.

* * * * * *

Now the government here is not relying on the second alleged act—the passage of money in October 1961—as an overt act in furtherance of the conspiracy. Rather it is maintaining only that proof of this act is one item of evidence, the passing of money in 1961 was just one act among others, going to the issue of whether in 1957 a con-

---

14. In Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the Supreme Court approved a charge which with certain qualifying language, in substance, instructed the jurors that if the greater number of votes were for conviction, the dissenters should consider whether their doubts were reasonable

ones. Similar charges have been upheld in this Circuit. See United States v. Thomas, 282 F.2d 191, 195 (2d Cir. 1960); United States v. Tolub, 309 F.2d 286, 289–290 (2d Cir. 1962); United States v. Kahaner, supra, 317 F.2d at 483–484.

spiracy to bribe Simon did come into existence, not whether there was a conspiracy in 1961, but you may consider the passage of money in 1961, which is conceded took place in the absence of the defendant, you may take that into consideration in your assessment of the total evidence relating to the conspiracy back in 1957 and 1958. In other words, you may consider it as some evidence of the original conspiracy.

The charge thus properly restricted the purpose for which the jury was to consider the 1961 payment to Simon. See Lutwak v. United States, supra.

*Guilt by Association*

■ (a) The portion of Birnbaum's attack on the charge that appears most serious to our dissenting brother is the allegation that Judge Cooper invited the jury to return a verdict of guilt by association by intimating that Birnbaum had been deeply involved in the questionable operations of Guterma, Leonhardt and Eveleigh. Appellant points specifically to certain passages of the charge as particularly damaging. He cites Judge Cooper's question to the jury:

> What manner of human beings in the main come before us? Certainly not the docile, the meek or the humble. They appear bold, aggressive, accustomed to swift financial deals with a twist. Men unacquainted with humility or sensitivity.

This statement, Birnbaum charges was intended to include him. But appellant overlooks the remainder of the paragraph:

> That does not mean that it necessarily follows that their testimony is unworthy of belief. The truth emerges from the most unlikely sources. In operations of the character which confront us the government must often rely and call to the stand even unsavory characters to count on their testimony to knit together the fragments of untainted evidence, to spell out a diabolical scheme.

It is thus clear that when Judge Cooper referred to "bold and aggressive" individuals "accustomed to swift financial deals with a twist," he was speaking not of Birnbaum, but of the government's witnesses—Guterma, Leonhardt and Eveleigh—a trio characterized by appellant's counsel in far stronger terms. Indeed, Judge Cooper did not in this or in any other portion of his charge urge the jury to find guilt by association. Rather, he instructed the jury, and properly so, that a witness might be telling the truth despite his otherwise questionable character.

(b) Appellant next directs our attention to the following paragraph of the charge:

> The government, in other words, maintains that these were birds of a feather who stuck together and the defendant was one of them. But it is for you to determine how deeply involved the defendant really was with the operations of Guterma and his clique. Was he one of the gang, to use the vernacular? Did Guterma and his associates let him in on the ground floor and reveal to him the full force of their operations, or was he on the outside looking in? Did they just use him for his particular professional skill without revealing their true objective?

Judging is not an exact science. The judge cannot instruct the jury in precise mathematical or symbolic terms, as the scientist can describe a particular phenomenon merely by stating its formula. Rather, words—often inadequate—are the medium that the judge must employ to instruct the jurors, and in this sense "the poet or philosopher might do a better job than the lawyer or judge." Friendly, "Learned Hand: An Expression From the Second Circuit," 29 Brooklyn L.Rev. (1962).

But Judge Cooper's selection of the language or metaphor complained of does not lead us to the conclusion that the charge was intended to prejudice or was in fact prejudicial to Birnbaum. We note that the passage to which appellant refers commences, "The government, in other words, maintains * * *," indicating that the judge was making it clear to

the jury that he was summarizing what he conceived to be the prosecution's position. And while there was no allegation that Birnbaum was a member of Guterma's "clique" or "gang," the jury could properly conclude from appellant's large profit on the Wickersham transaction and his numerous contacts with Leonhardt and Guterma, that he indeed was a close associate of these men.

Moreover, even if the judge's rhetoric might have ignited a flame of emotions, he quickly doused the spark. The judge promptly added these words:

> Bear in mind that in the professions, even more so than in business, often clients make use of professional advice and direction without revealing, in fact designedly hiding, the illegal act, yes, even the foul deed he contemplates and when caught, he points accusingly at the unsuspecting professional whose aid he sought. Do you think that was the situation here from the entire record? You might ask yourselves whether the association of the defendant with this group was that of a professional who suspected the character of their operations, yet confined his activities to just giving professional services not to propel or perpetuate an unholy scheme, but in the sense that a physician or an attorney administers to the distressed with full knowledge that the beneficiary of his ministerings is deeply involved in sin?
>
> If you find that such was the case, then the defendant was not a willing participant in the illegal plan, either to conspire or to bribe. I suggest this to you, not to indicate how the Judge feels, but to make you aware how carefully you must dissect the testimony.
>
> \* \* \* \* \* \*
>
> In this day and age, many a professional is called in to render a service, and while he is rendering the service, he suddenly detects something or he is suspicious. There is something improper about to take place. What is he to do? Just by having heard this, does that make him a party? Of course not.

That is where the emphasis on intent to do an unlawful act comes in.

Thus, with these considered words, the judge made it perfectly plain that Birnbaum's involvement in the Wickersham transaction did not necessarily lead to the conclusion that Birnbaum was involved in the subsequent bribe of Simon. Indeed, he gave the jury much food for thought before it could find this professional man guilty. And in case the point had not been driven home clearly enough, a few moments later Judge Cooper reiterated:

> Mere association, mere association without more, is not proof of participation in a conspiracy. If a person associates himself with people who are not personally acceptable to you, you may not draw any adverse inference merely from that association. His guilt or innocence must be determined on the basis of his own acts.

These statements do not square with appellant's contention that Judge Cooper was inviting a verdict of guilt by association.

(c) Continuing to dissect the charge and to consider each portion in a vacuum, Birnbaum also cites the following statement:

> Having themselves been caught, why should he get off? He was as much a part of it as they. They might even reason that he was as much a party to it as they by obtaining professional fees, and he got them from them, without more. That they should stick him as much as they were stuck. I am talking the kind of language that people indulge in who think along those lines.

Appellant then rhetorically asks us in his brief, "What was all this about, we ask, and what was the jury to make of it?" This question is not nearly so difficult to answer as Birnbaum would have us believe. In fact, we are quite certain that appellant could have answered his own inquiry had he recalled the first sentences

of the paragraph he quotes, for Judge Cooper began his statement:

> Now, why, inquires the government, or what purpose can possibly prompt Guterma, Eveleigh and Leonhardt to testify falsely? They have already served their sentences, they have nothing to gain. You might so conclude, but not without weighing other possibilities, including the desire for revenge.

It was after this prologue that the judge proceeded, in the passage cited by Birnbaum, to offer possible reasons why the government's witnesses might have testified falsely. Once again, the passage not only failed to prejudice Birnbaum but affirmatively aided his case. It appears to us that in his zeal for obtaining a reversal, Birnbaum seems to have concluded that the trial judge could do little that was proper—even in those instances when the charge was clearly in the appellant's favor.

(d) Finally, Birnbaum calls our attention to the following statement of Judge Cooper, appearing toward the conclusion of his charge:

> Now take another thing. The government contends, or at least this is my suggestion, that the defendant was up to his ears in graft and corruption, with the Denver deal, with the various transactions from which he made a profit; that they were shady in character, he well knew, and this was long before Simon made his appearance on the scene.

When viewed in the perspective of the full charge, we cannot say that this was prejudicial. Cold words in isolation are a poor barometer of the true trial atmosphere. It is evident to us that when this portion of the charge was read, it had been made abundantly clear to the jury that the Denver deal—or Wickersham transaction as we have referred to it— was relevant only to the issue of possible motive for Birnbaum's alleged participation in the bribe, and that the government was not charging appellant with any crime other than his alleged complicity in that act.[15] At this late stage of the charge we do not believe that the descriptive language could have confused or prejudiced the jury.

### Comment on the Leonhardt-Birnbaum Tape

Birnbaum complains that Judge Cooper erred by failing to instruct the jury that the tape of the October 2 conversation with Leonhardt was favorable to him. He points to the fact that Leonhardt, although attempting to trap Birnbaum into making damaging admissions, never accused Birnbaum to his face of participating in the bribery of Simon. This indicates, Birnbaum suggests, that he was not implicated.

The subject matter of the tape was extensively covered in the summations of the prosecutor and defense counsel and Birnbaum placed heavy emphasis on this evidence. While Judge Cooper commented only briefly on the tape during his charge to the jury, appellant criticizes the

---

15. During the colloquy that followed the judge's charge, defense counsel objected to this, as well as other portions of the instructions. With regard to Judge Cooper's statement that "the defendant was up to his ears in graft and corruption," the prosecutor, motivated, we believe, by an excess of caution, stated that "the government would have no objection" if the judge wished to make even more clear that the government was alleging "corruption only with respect to the particular charges mentioned in the indictment." But, the prosecutor most certainly did not suggest or imply that he believed the charge had been misleading in any respect. In fact, he stated, "the government thinks that fact [that no broad allegations of corruption were being made] is clear from the total charge of the court."

Judge Cooper, in order to give a considered judgment to the objections and in fairness to Birnbaum, did not summarily rule but ordered a brief recess to "go over * * * [the exceptions] in my own mind." He apparently concluded after some thought, as we have (and the government had) that the charge was clear and not prejudicial. He might well have believed that any further instructions to the jury would not clarify but confuse.

judge's remarks as unfair. But, it is interesting to note that the brief excerpt from the transcript of the tape which the judge read, contained this favorable statement by Birnbaum. "Simon would never recommend something that's against the government's interest." It is thus difficult for us to comprehend any fair basis for appellant's complaint.

Moreover, Birnbaum never requested the court to charge *in haec verba* that it was significant that Leonhardt failed to accuse Birnbaum of being implicated in the bribe. "It is quite impractical for a trial judge, summarizing a case to a jury, to develop each piece of evidence offered in support of an indictment, each item offered in rebuttal, and each opposing inference to be drawn. An appellate court reviewing such a summary not only must consider it as a whole but must place it in the jury's hearing of the evidence and the summations of counsel." United States v. Kahaner, supra, 317 F.2d at 479.

We have already noted, that able defense counsel placed great emphasis on the tape and stressed to the jury all the inferences which it could draw in Birnbaum's favor. It was for the jury to decide whether the tape did, indeed, prove Birnbaum's innocence, or merely revealed that he was on his guard during the meeting and thus avoided any discussion of the bribery.[16]

In summary, upon reviewing the entire charge and considering each of appellant's arguments,[17] we are of the view that if errors were committed, they were but separate, unintentional, isolated and non-prejudicial instances, and that none of Birnbaum's contentions, either individually or collectively, demonstrate that he was deprived of a fair trial.

16. At the very beginning of the conversation, for example, Birnbaum denied knowing Simon, but his subsequent remarks cast doubt on the veracity of his denial—

L: * * * You know SIMONS was in to see me, that's why I wanted to talk to you.
B: Oh, yeah?
L: * * * that Revenue agent, you know.
B: I don't know him.
L: You forgot about him, huh? I haven't cause I haven't finished with him yet.
B: * * * Inaudible * * *
L: Not yet.
B: * * * Inaudible * * * I thought he closed the case.

17. In addition to the attacks on Judge Cooper's charge already discussed in detail, Birnbaum raises other contentions which may be disposed of summarily:

a. *The Frame of the Charge.* It is clear that Judge Cooper referred to the jurors as "ministers of justice" only to impress them with the seriousness and solemnity of their task. The record is clear that in summarizing the facts to the jury, the judge was careful to emphasize that he was not commenting on the evidence, that the jurors were the sole and exclusive judges of the facts, and that they should not attempt under any circumstances to read anything into his remarks.

b. *Credibility of the Witnesses.* Judge Cooper did not instruct the jury, as claimed, that the government's witnesses had "nothing to gain" by testifying against Birnbaum. Though not cataloguing every reason why they might testify against Birnbaum, the judge did elaborate quite favorably to the defendant on the possibility that a desire for revenge might have led them to lie. Nor did the charge instruct the jurors that the government's failure to indict its witnesses was irrelevant in determining their credibility. Rather, the judge explained that this failure to indict did not establish that Guterma, Leonhardt and Eveleigh had not conspired with Birnbaum. Finally, there is no merit to appellant's claim that Judge Cooper should have charged the jury that it *must* consider the criminal records of the government's witnesses when determining what weight to give to their testimony. The jury was free to accept or disregard any relevant evidence presented.

c. *Assumed Facts.* The portion of the charge to which appellant objects did not assume any facts. Judge Cooper was careful to note that he was only recounting Eveleigh's testimony.

d. *Erroneous Conclusion.* Judge Cooper did not conclude on an erroneous note. The jury was well aware of the heavy burden of proof which the government had to meet. On at least eight separate occasions the jurors were instructed that guilt must be proven "beyond a reasonable doubt."

### V.

There remains one last contention raised by the appellant which we must consider. At Birnbaum's first trial the tape of the Leonhardt-Birnbaum conversation was not made available to the appellant, and therefore he was unable to use it to cross-examine Leonhardt. On appeal from his first conviction, Birnbaum urged that the trial court's failure to order the production of the transcript of the conversation was a violation of the Jencks Act, and constituted reversible error. The issue presented for our consideration at that time was whether the tape related "to the subject matter as to which the witness has testified," 18 U.S.C. § 3500. Whether the tape was so "related" to Leonhardt's direct examination turned on whether it related "generally to the events and activities testified to." United States v. Cardillo, 316 F.2d 606, 615 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963).

After examining the transcript of the conversation, we concluded:

> [W]e are unable to agree that the trial court's ruling can be fairly characterized as clearly erroneous. This determination does not mean that on a new trial when the facts may be developed in a different manner, a different position should not be taken and that the trial judge may not exercise his discretion in a different manner. [337 F.2d at 498.]

■ After the first appeal, and before the second trial commenced, Leonhardt died. Judge Cooper followed the established rule in the federal courts that testimony given in a former criminal trial is admissible in a retrial of that cause, see Coppedge v. United States, 114 U.S. App.D.C. 79, 311 F.2d 128, 132 (1962), cert. denied, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963). He allowed the prosecution, therefore, to read Leonhardt's testimony.[18] The judge also ordered the government to turn over the transcript of the Leonhardt-Birnbaum

tape to appellant, and Birnbaum introduced it into evidence and argued its contents to the jury.

■ Appellant now urges that at his first trial he was denied the opportunity to properly cross-examine Leonhardt because the tape had not been made available, and therefore Judge Cooper committed reversible error by allowing Leonhardt's testimony to be read to the jury. We find this contention to be without merit. On the first appeal we concluded that withholding the tape from appellant had not been shown to be prejudicial. Implicit in our holding was our recognition that appellant had not been denied an adequate opportunity to cross-examine Leonhardt. In light of our decision, it was permissible for the prosecution to introduce Leonhardt's prior testimony. The fact that at his second trial Birnbaum was given the tape does not alter this. It was Birnbaum who made the decision to introduce the tape into evidence, and a by-product of Leonhardt's absence was that Birnbaum benefited. Leonhardt could not be produced by the government to give his reasons for failing to confront Birnbaum with the latter's alleged participation in the Simon bribery—an omission Birnbaum showed little reluctance to drive home to the jury. Birnbaum would "have his cake and eat it too," were he permitted to reap this benefit flowing from Leonhardt's unavailability, and at the same time to succeed in having Leonhardt's former testimony excluded on the ground that he was not adequately cross-examined. The judge did not err in allowing this testimony to be read.

### VI.

Essentially we have been engaged here in a search for the meaning and motivations that lay behind the words and acts of the trial judge, and the likely effect of his overall conduct upon the jury. We are mindful that such a course is fraught with the possibility that we will misinterpret what has in fact taken place, for there is

---

18. The trial court deleted that portion of Leonhardt's testimony which we had found on the first appeal to be inadmissible as a hearsay statement of Simon's remarks.

no scientific method by which to reconstruct the atmosphere of the trial and the impact of words on men's minds. Because of our own predilections, there is always the hazard that one may imagine emphasis where none was intended or resulted. It is all too easy for appellate judges, removed from the heat of the adversary fray, to divine, as if omniscient, what the trial judge should have said, and when silence would have proved the wiser exercise of judgment. We have tried to view the charge in its entirety, weaving each sentence into its proper context in the fabric of the charge. Our efforts have led us to conclude that in totality the trial was fair, the charge was fair, albeit we might not have expressed ourselves or ordered our charge as did the trial judge, and the errors, if any, slight. In short, none of appellant's contentions merit a reversal of his conviction.[19]

Judgment affirmed.

LUMBARD, Chief Judge (dissenting).

I would reverse the conviction. In my view the trial court's charge to the jury went so far beyond the permissible limits of comment that it denied Birnbaum the fair trial to which every defendant is entitled. The lengthy and confusing charge contained many irrelevant observations and emphasized arguments which were prejudicial to the defendant. On the points other than the judge's erroneous and unfair charge, I concur in Judge Kaufman's opinion.

While every trial judge would have his own views on how extensively to discuss the evidence in the case in his charge to the jury, here the trial judge had the benefit of the example of a charge in this very case upon the first trial. Judge Murphy's charge was a model of clarity and brevity; it informed the jury of the applicable statutes, the questions of fact which the jury must decide and the appropriate rules to be applied in making its decisions.[1] The charge on the first trial contained a minimum of comment on the evidence; in the printed record it covered 19 pages. There was little more which the trial judge needed to cover after the second trial but his charge covers 56 printed pages of the record because of his numerous comments. If ever there were an example of the wisdom of keeping the judge's charge down to a minimum of what the case requires it lies in the comparison of the charges to the jury on the first and the second trials of this case. Thus it is not too surprising that the additional two hours which the second jury spent in listening to the ruminations of the trial judge were freighted with much unnecessary matter. Instead of remaining an impartial arbiter instructing the jury on its duties, the judge at many points argued and emphasized the government's contentions. A reading of the charge makes it crystal clear that the judge was strongly of the view that the defendant was one of Guterma's gang, that he was guilty and that it was the duty of the jury to convict him. Had this been done fairly we ought still to affirm as I cannot disagree with my brethren in their conclusion that proof of guilt was overwhelming. But here the trial judge imported many extraneous considerations into the case; he emphasized matters which did not need mention;

---

19. "We have agreed * * * that certain instructions are not to be commended, but this does not imply that they were prejudically erroneous, or even that they were erroneous. There are different ways of saying the same thing. Trial court judges sometimes seem to have difficulty in keeping their instructions short and clear; appellate court judges seem to have the same difficulties with their opinions. In fact, this opinion might well have been limited to the statement: We have carefully considered all of the assignments of error and find no prejudicial error; judgment affirmed." State v. Williams, Wash., 416 P.2d 350, 355 (1966) (footnote omitted).

1. On appeal, this court sustained one of the two objections to Judge Murphy's charge, dealing with the appraisal of character evidence, 337 F.2d at 498–99, and the trial court had the benefit of this ruling in framing its charge.

and he argued the government's side of important bits of evidence.

The government's case depended upon whether the jury believed the essentials of the testimony of Guterma, Eveleigh and Leonhardt. The defense argued that these three government witnesses were not to be believed in view of their past records and their low regard for truth-telling and because they had good reason to earn consideration from the government by implicating Birnbaum. The references to these witnesses emphasized the government's position and omitted entirely any mention of the possible reasons for giving false testimony against Birnbaum. After stating the government's position that, having served their sentences, they had nothing to gain in giving testimony, he suggested that the jury weigh the possibility of revenge as a motive. The trial judge made no mention of the evidence that Guterma was then on parole and that Eveleigh was under an order of deportation, and when this omission was called to his attention by defense counsel, the judge refused to correct his comment. In addition, the judge made no allusion to the fact that when Leonhardt gave his testimony he had a federal fraud indictment pending against him.

Moreover, the trial judge made it clear in several ways that it was important that the jury consider Birnbaum's relationship with these three witnesses because Birnbaum might well be as bad a person as every one of them. Of course this was not the charge before the jury; the question was not guilt by association, but whether Birnbaum assisted in the bribing of Simon. After a detailed and lengthy summary of the government's case, followed by numerous generalizations regarding the law applicable to the conspiracy charge, the trial judge stated:

"What manner of human beings in the main came before us? Certainly not the docile, the meek or the humble. They appear bold, aggressive, accustomed to swift financial deals with a twist. Men unacquainted with humility or sensitivity. That does not mean that it necessarily follows that their testimony is unworthy of belief. The truth emerges from the most unlikely sources. In operations of the character which confront us, the government must often rely and call to the stand even unsavory characters to count on their testimony to knit together the fragments of untainted evidence, to spell out a diabolical scheme.

"The government, in other words, mantains that these were birds of a feather who stuck together and the defendant was one of them. But it is for you to determine how deeply involved the defendant really was with the operations of Guterma and his clique. Was he one of the gang, to use the vernacular? Did Guterma and his associates let him in on the ground floor and reveal to him the full force of their operations, or was he on the outside looking in? Did they just use him for his particular professional skill without revealing their true objective?"

The clear implication was that it would be enough for the jury to find that Birnbaum was "one of the gang," as he then would know what was going on and would be a party to it. While it is true that the court followed this with the suggestion that an accountant does not always know what his clients are up to and that he is not guilty if he merely gives professional advice, this did not redress the balance because somewhat later the judge returned to the theme in words which startled even the prosecutor:

"Now, take another thing. The government contends, or at least this is my suggestion, that the defendant was up to his ears in graft and corruption, with the Denver deal, with the various transactions from which he made a profit; that they were shady in character, he well knew, and this was long before Simon made his appearance on the scene. Well, the defendant concededly made out the returns for Leonhardt for 1955 and for a few years before. He knew Leonhardt. He said he did. He testified he knew him.

"Well, then, if that was the relationship between Leonhardt and the defendant as of the close of 1956 when Simon first made his appearance, what importance do you attach to two pieces of evidence: one, that the defendant was no longer Leonhardt's accountant? Two men, says the government, corrupt, having something on one another, yet they bust up their relationship as accountant and client. What do you make of the letter that the defendant sent around that time asking for a professional fee? What weight do you give that?"

This is the stuff of which prosecutors make their summations; it ought not to be the stuff with which judges charge juries. The issue was not whether Birnbaum was "up to his ears in graft and corruption," or whether he had made a profit from some deals which were "shady in character." Indeed, the government never charged this, as the prosecutor made clear after defense counsel had objected to this part of the charge during the colloquy which followed the completion of the judge's charge. What the prosecutor then said makes it clear that the language could be and must have been construed to mean that the government was charging Birnbaum with being a corrupt man:

"I would also suggest that your Honor might consider Mr. Bauman's exception with regard to your Honor's statement to the contention that Birnbaum was up to his ears in corruption. A fair reading would indicate to the jury that the government is charging corruption only with respect to the particular charge mentioned in the indictment. We are not making a broad allegation of corruption. That is crystal clear in the charge as it exists now, but if your Honor wishes more precisely to define that to the jury, the government would have no objection. In other words, to say to the jury that the only charge of corruption being made is the corruption charged in the indictment. That would clean up any other implications which the jury

might read from your Honor's charge, that maybe the government is charging corruption in other areas. If your Honor wants to pinpoint that to the jury, the government would have no objection, although I will say the government thinks that fact is clear from the total charge by the court."

Although the trial judge himself commented that the prosecutor "seems to think the expression might be misleading" and although he then took a brief recess "so I can go over it in my own mind," he refused to make any correction whatever.

This portion of the charge was immediately followed by further argument by the court which was confusing if not irrelevant in its reference to a letter Birnbaum sent to Leonhardt asking for a fee:

"Is this from a man who has reason to believe that the fellow to whom he sent the letter got something on him? I only mention this to have you closely examine the evidence, including the exhibits. Of course, those letters could have been sent and the relationship between the two, as accountant and client, may have been for the purposes of appearance so that people wouldn't judge what is going on between them. But you've got to weigh these things."

Birnbaum further points out that the trial judge placed undue emphasis upon the October 1961 incident where it was conceded that Leonhardt, then cooperating fully with the F.B.I., went to Simon and paid him $1,250 in cash. The judge admitted this evidence under our holding on the first appeal that the evidence could be received in the discretion of the trial judge but only on the question whether in fact the conspiracy charged had been in existence in 1957 and 1958. Judge Murphy in his charge to the first jury merely mentioned this incident as an alleged overt act. Despite the fact that we had pointed out the very limited purpose for which the evidence should be received, Judge Cooper referred to the incident on four occasions, in a manner which must have had the effect of injecting it into

the case against Birnbaum for all purposes. In view of the very tenuous and limited nature of this evidence I think it was an abuse of the judge's discretion to make these repeated references.

The last three references to the 1961 incident were wholly unnecessary. Thus the second reference was stated as a mere reminder: "You will remember, for example, that I have instructed you that you may not consider as evidence of defendant's membership in the conspiracy the stipulated fact that in 1961 money passed between Leonhardt and Simon out of the presence of the defendant."

Nor was there any need to refer to the 1961 incident in the discussion of the overt acts, especially as the government on this second trial was not relying upon this overt act. Nevertheless, the trial judge again mentioned it in these words:

"Now the government here is not relying on the second alleged act—the passage of money in October 1961—as an overt act in furtherance of the conspiracy. Rather it is maintaining only that proof of this act is one item of evidence, the passing of money in 1961 was just one act among others, going to the issue of whether in 1957 a conspiracy to bribe Simon did come into existence, not whether there was a conspiracy in 1961, but you may consider the passage of money in 1961, which is conceded took place in the absence of the defendant, you may take that into consideration in your assessment of the total evidence relating to the conspiracy back in 1957 and 1958. In other words, you may consider it as some evidence of the original conspiracy."

And later, among a number of disconnected and wholly unnecessary comments, toward the end of his long charge, in suggesting "some of the things which you should consider," the first on the list was the 1961 incident, without any explanation of its limited relevance:

"A few comments about the passage of money in 1961. What was it? Was it an innocent act, perhaps involving repayment by Leonhardt to Simon of a legitimate debt? Was it a part or whole of a bribe from Leonhardt to Simon, separate and apart from the schemes charged in this indictment, perhaps reflecting the concern Leonhardt had for the Denver audits? Was it a payment deferred from what Leonhardt owed Simon on the bribe for the 1957–1958 scheme? Was it a tainted payment for other matters not disclosed upon the record?"

Placed as it was as the first on the list of matters to be considered in this further summation of the evidence regarding *Birnbaum's guilt on both counts*, the judge threw it in for consideration on the whole case. Furthermore, what was the jury to think when the judge asked the question, "Was it a tainted payment for other matters not disclosed upon the record?" Did this imply participation by Birnbaum in the payment? After the charge was finally ended, counsel took exception to the court's "repeated references to the passage of money in 1961," all to no avail.

No matter how overwhelming the proof may seem to the trial judge, or to the appellate court which later passes on the case, the trial judge must keep his role of an impartial arbiter. If he is to give a balanced charge which will instruct the jury so that their role is clarified and the issues are suitably simplified, he is well advised to limit his comments on the evidence. The issues here were simple enough and could have been simply stated. These same issues were treated by Judge Murphy in the first trial in a brief and succinct charge. Here the trial judge stepped out of his role and was carried away by his advocacy into remarks which obviously were as extemporaneous as they were unnecessary. In many respects his arguments went beyond those of the prosecution and misstated the claims of the government. There can be no fair trial where the trial judge so abuses his power and puts his great and unquestioned influence in the scales against the defendant. Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933).

Where the judge's charge contains so many irrelevant and improper arguments

which clearly are prejudicial to the defendant we cannot say that the defendant has been fairly tried. In such a case the verdict should be set aside. It matters not how guilty the defendant may be nor how many juries have said so. The proceedings are tainted and should not stand.