Jacob JUVERA, Benito Juvera and Daniel Juvera, Appellants,

v.

UNITED STATES of America, Appellee.

No. 20179.

United States Court of Appeals Ninth Circuit.

May 9, 1967.

Rehearings Denied July 3, 1967.

Edward I. Gritz, Russell E. Parsons, Los Angeles, Cal., for appellants.

Warren Wilson, San Francisco, Cal., for appellant, Jacob Juvera.

John L. Cardoza, San Francisco, Cal., for appellant Benito Juvera.

Manuel L. Real, former U. S. Atty., Wm. M. Byrne, Jr., present U. S. Atty., John K. Van de Kamp, Chief Asst. U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Asst. Chief Crim. Div., Donald C. Smaltz, Gerald Uelman, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before POPE, MERRILL and KOELSCH, Circuit Judges.

POPE, Circuit Judge:

The appellants are three brothers who at the times here in question resided in or near Los Angeles, California. They were jointly indicted and charged in two counts with knowingly importing and bringing some 426 grams of heroin, a narcotic drug, into the United States from Mexico, and with knowingly and unlawfully concealing and facilitating the concealment and transportation of that quantity of heroin, which, as the defendants then and there knew, previously had been illegally imported into the United States. All three defendants were found guilty by jury verdict and sentenced to terms of imprisonment, from which sentences each of them has appealed to this court.

What transpired in the process of importing this heroin from Tijuana, Mexico, to Los Angeles, is undisputed. The mode adopted by those undertaking the importation was an elaborate one. It was cleverly planned and executed. And another extraordinary feature of the importation process was that the person hired and paid to move the narcotics across the line informed the government agents of every move made by him and by the defendants in receiving the narcotics; and, in consequence, except for

a period of but a few moments, the vehicle carrying the heroin, and the persons receiving it or riding in it, were under constant surveillance by these agents, a surveillance carried on by as many as a dozen such agents, operating in separate government cars and in continuous radio contact with each other. Hence these agents were able to testify as to exactly what each participant in the importation, including the defendants, was doing at all times on the date in question.

An examination of all these details showing just how the importation was accomplished, and what part each participant played, leads to the necessary and unavoidable conclusion that the whole enterprise was pursuant to a carefully designed plan and that each of the defendants was playing his assigned part in that plan, all of the details of which were precisely as carried out and performed.

The importation referred to occurred on March 2, 1964. The plan began at Tijuana and was put in motion by one Raul Gonzales who resided there. Gonzales bought a 1951 Plymouth automobile equipped with California license plates and arranged with one Miramontes, also a resident of Tijuana, to bring the automobile to Los Angeles. Gonzales, with some tools which he owned, cut a hole in the sill under the right hand front door of the Plymouth automobile, making a trench-like opening large enough to contain five rubber condoms containing heroin. He then covered this trench with metal cover and sealed over the hole or opening with grease and dirt so as to obscure the fact that an opening had been there. Gonzales then instructed Miramontes where to deliver the Plymouth car and its contents and paid him $200 for this service. As a part of the instructions he handed Miramontes a post card with a picture of a motel known as the Tick Tock Motel at 1444 South Atlantic Boulevard, Los Angeles. On the card was the motel's telephone number and written on the card was the name "Daniel", the name of one of the three brothers. This card, thus marked,

served as Miramontes' guide as to where and how to reach the defendants, the intended recipients.

Miramontes kept the government agents informed of his movements and of the fact that he was transporting heroin in the car. As he passed through San Diego he stopped at a garage where several government agents were waiting for his arrival. While he was there the agents opened up the recess in the door sill and took photographs of the heroin and its containers and then recovered and re-sealed the place where the heroin was stored. Miramontes then continued his trip to Los Angeles and drove to a place known as Brandi's Coffee Shop. One of the government agents was there waiting. Miramontes entered the telephone booth at this drive-in eating place and then called the telephone number which was on the card showing the Tick Tock Motel which Gonzales had given him. A man answered when he called the number and Miramontes asked for "Daniel". The man answering said he was that person. Miramontes reported to him that he had left the freeway and did not know how to get to the Tick Tock Motel and asked for directions. The person answering, after identifying himself, asked Miramontes to wait until he could talk to his brother who was more familiar with the place. Miramontes then talked to the brother Jacob who asked for the telephone number from which Miramontes was calling. He asked for the location of Brandi's Coffee Shop and was told by Miramontes where it was located. Jacob then told Miramontes to wait there, "We are going over there to see if we can localize you or find you and if not, we will call you."

At the time Miramontes made this call Jacob and Daniel were outside the Tick Tock Motel near the telephone booth. Government customs agents were watching them. The brother Benito resided at the motel in a unit located next to the office and designated No. 26. Just prior to Miramontes' telephone call, Jacob was seated in a white Cadillac car. Standing just outside the Cadillac was

Daniel. When the call came, Daniel first answered the telephone, then he called Jacob; and Jacob completed the telephone conversation with Miramontes, exchanging information as to where the parties were located and the telephone numbers, all as previously indicated. When the telephone rang Benito came out of the motel unit 26 and moved over to the telephone booth. All three brothers listened to the conversation. One of the government agents then moved over close to the office of the motel which was next to the telephone booth for the purpose of listening to the conversation. Benito approached the agent as he moved toward the phone booth and said to him, "What do you want?" The agent heard the reference to the telephone number of Brandi's Coffee Shop and made a note of it. After Jacob told Miramontes that they would come to Brandi's to try to find him, all three brothers got into a Buick automobile which belonged to Benito and which was parked in front of his unit. In 15 or 20 minutes they had reached the coffee shop. There Jacob got out of the Buick, went to Miramontes and learned he was the man they were looking for. Jacob then pointed out the others as his brothers. The brothers told Miramontes to follow the Buick with the Plymouth and Jacob got into the Plymouth with Miramontes and they all drove to the Tick Tock Motel. On arrival there Miramontes was sent into the motel bar to wait for the brothers. Miramontes saw the three brothers get into the Plymouth car together. That is the last he saw of them.

Nothing appears in the record as to how long the three brothers thus remained in the Plymouth. Mrs. Lang, a Los Angeles police officer who was also engaged in surveillance of the area, saw the Plymouth drive out the alley entrance. She was unable to say how many were in the Plymouth at that time. However, shortly thereafter the Plymouth car and the white Cadillac car were driven to Jacob's residence at 1520½ Beverly Terrace, Los Angeles, which was an apartment where Jacob and Daniel were living. Daniel drove the Plymouth car and Jacob drove the white Cadillac. Benito's Buick car remained parked opposite his unit 26 at the Tick Tock Motel where Benito remained. A number of government agents followed these two cars as they proceeded to the Beverly Terrace address and they described the course the cars traveled as a zig-zag one, proceeding by turning first right and then left in a manner indicating that they were attempting to avoid being followed. When Jacob and Daniel stopped at the address mentioned, they were both placed under arrest, and when Daniel was asked what he was doing with the Plymouth car he replied that he had stolen it. Both of these defendants were asked about narcotics in the apartment. Both gave the officers permission to search it. No narcotics were found in the apartment during the search, but a quantity of milk sugar, a product commonly used to cut or dilute heroin, was found. The officers also found three more Tick Tock Motel post cards indicating that Jacob or Daniel must have sent Gonzales the card he gave Miramontes.

Some of the officers then present returned to the Tick Tock Motel to talk to Benito who had gone to bed. Benito let them into his unit and stated that the Buick parked in front of the unit was his. He was then placed under arrest and notified that it was for narcotics violation. Benito was then taken to the government car. He was asked how they could get back to the residence of his brother and he said "Claude" lives at a certain address. The agent said "How about your other brothers?" He replied they were in the Los Angeles area but "I do not know exactly where they live." He was asked if he was not with them earlier in the evening and he replied: No, they had come by his place and borrowed his car but he himself had been with his wife at a party that evening and he had not been with his brothers in his own car that particular night. This was obviously a falsehood.

It is plain that the government officers made a massive effort to trace the shipment and importation of these narcotics. It is plain that the agents were informed by Miramontes that he would first stop at Brandi's Coffee Shop, for the officers were waiting there when he arrived, and some of them listened in on the telephone call. The officers were maintaining surveillance both at Brandi's and at the Tick Tock Motel and were obviously waiting for the telephone call to reach there. When the telephone rang at the Tick Tock Motel they observed that all three of the brothers participated in the conversation. Daniel first answered the telephone, then called Jacob, and then Benito came out of his unit and went over and listened in on the conversation. Clearly the three brothers were the persons who were the planned recipients of the delivery of the narcotics. The Tick Tock Motel was a key location for locating them; this had been indicated to Miramontes by the picture post card, with the telephone number and Daniel's name; and Benito was strategically located there, next to the telephone booth.

The evidence points irrefutably to a joint enterprise by the three brothers involving their joint receipt of the imported narcotics and this evidence indicates unquestionably that they knew and understood the arrangement and the timing and the delivery. It is plain that the whole enterprise was carefully planned for precise operation. The quantity of the heroin, here involved, was extraordinarily large. It amounted to approximately one pound, and when cut, by use of the milk sugar which was found in the apartment, it would represent a very large sum of money. Wholly apart from any presumption arising from possession, the circumstances demonstrate that these defendants necessarily knew they were importing and receiving narcotics from Mexico.

The court charged the jury as follows: "The elements of the offense charged in Count 1 are as follows: First. The act of importing and bringing the alleged heroin into the United States contrary to law, or the act of inducing or procuring or causing the importation and bringing of the alleged heroin into the United States contrary to law; Second. Doing such act or inducing or procuring or causing said act to be done knowingly and unlawfully." [1]

The court also instructed the jury as to the consequences of proof of possession of the narcotic drug as defined in the last sentence of Section 174 of Title 21.[2]

■ Since all of the defendants at some time after the arrival of the Plymouth automobile at Los Angeles had possession of the automobile and hence of the narcotic drug, it is plain that there was adequate proof of the knowledge of importation in more ways than one. There cannot be any question that there was adequate proof of possession here, actual or constructive.

The court instructed the jury with respect to possession as follows: "The law recognizes two kinds of possession; actual possession and constructive possession. A person who knowingly has direct physical control over a thing, at a

1. The court also charged the jury as follows: "Three essential elements are required to be proved in order to establish the offense in Count 2 of the indictment.
   First. The act or acts of receiving or concealing or in any manner facilitating the concealment or transportation of a narcotic drug, heroin, as alleged, which narcotic drug, heroin, had been imported into the United States of America contrary to law as charged; and
   Second. Doing such act or acts knowingly and fraudulently and unlawfully; and

Third. Knowledge of the accused that the narcotic drug, heroin, had been imported into the United States of America contrary to law as charged."

2. This sentence reads as follows: "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

given time, is then in actual possession of it. A person who, although not in actual possession, knowingly has the power and intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

The law recognizes, also, that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, their possession is joint.

If you find from the evidence beyond a reasonable doubt that the accused either alone or jointly with others, had actual or constructive possession of the heroin described in the indictment, then you may find that such heroin was in the possession of the accused within the meaning of the word 'possession' as used in these instructions."

These instructions were given without objection on behalf of any of the defendants and is the law of the case, and is in conformity with the law as laid down in previous decisions of this court.[3]

Other contentions are made here which are too frivolous to be worthy of comment. Thus it is asserted that because Miramontes, the government informer, was the person who actually carried the narcotics across the boundary, no crime was committed here. Nothing is more common than to have convictions of unlawful sales upheld where the purchaser is a government agent. It would be equally absurd to argue that in such cases no crime was committed. Haynes v. United States, 5 Cir., 319 F.2d 620.[4]

Also appellants assert that that portion of § 174 which makes possession prima facie evidence of guilt is unconstitutional. This also is an utterly groundless assertion. Yee Hem v. United States, 268 U.S. 178, 184, 45 S.Ct. 470, 69 L.Ed. 904.

Finally, it is contended by two of the defendants that they were denied the effective assistance of counsel and did not have effective representation because the same trial attorney represented all three defendants at their trial. It is. argued that it was essential that the trial judge at the commencement of the trial discuss with the defendants the problems relating to representation of the several defendants by one counsel, pointing out to them the disadvantage that might arise should there be conflicting interests to be represented by the attorney. We find this contention without merit for the reasons recently noted by us in Lugo v. United States, 9 Cir., 350 F.2d 858.

We find nothing in the record in this case which shows a conflict of interest between these defendants. The evidence heretofore noted by us puts them all in the same boat. Obviously all were participants in a very cleverly designed plan to import heroin from Mexico and covering their tracks in the whole operation. Benito was placed in a strategic position next to the telephone which bore the number that appeared on the post card handed to Miramontes and which the latter was instructed to call. Obviously it was a part of the scheme to list Daniel's name on the card so that Benito's name would not be tied in with the telephone number. Benito listened in on the telephone call and when the

---

3. Cellino v. United States, 276 F.2d 941; Hernandez v. United States, 300 F.2d 114; Eason v. United States, 281 F.2d 818, 87 A.L.R.2d 842; Rodella v. United States, 286 F.2d 306; Williams v. United States, 290 F.2d 451. Similar decisions in other Circuits are collected in Hernandez v. United States, supra.

4. The proof of importation by the defendants is not based upon any claim of mis-

conduct by Miramontes. What Miramontes did here was to transport the automobile as a container of narcotics in the same manner in which an express company might have transported a box of narcotics as a common carrier. The defendants here are being prosecuted for their own wrongful acts and intent and not as aiders or abettors of some government agent.

call had barely been concluded he had his Buick car in position so that the three brothers could climb in the front seat and drive to Brandi's and pick up the narcotics. It is plain that the arrangement was made that Miramontes would not drive to the Tick Tock Motel but should reach Brandi's or some other location and telephone from there so as to obscure the trail to be followed in delivering the heroin. When, as Miramontes testified, all three brothers climbed into the Plymouth automobile, as they bid Miramontes good-bye, it is plain that all three were checking the car to make sure that the heroin was there. It is inconceivable that any defense available to any of them could not be properly presented at the trial by the single lawyer.

In Lugo v. United States, supra, we said (p. 859): "On the other hand, absent a conflict of interest which interferes with the proper presentation of the defense of one of the codefendants, the mere fact that both are represented by the same attorney is not grounds for reversal." "Since Glasser v. United States, 315 U.S. 60, * * * it has been clear that some conflict of interest must be shown before an appellant can successfully claim that representation by an attorney also engaged by another defendant deprived him of his right to counsel." United States v. Dardi, 2 Cir., 330 F.2d 316, 335.

We find no reason for reversal in the fact that the three brothers retained the same counsel, particularly since the record shows no respect in which counsel failed adequately to represent all of the defendants. On the appeal the defendant-appellants employed different and separate counsel. They first filed a single brief, by attorneys Gritz and Parsons. In this brief it is acknowledged that Benito got into the Plymouth: "Benito Juvera was in the Plymouth car only for an extremely short period of time." Thereafter separate briefs were filed by different counsel, one for Jacob and another for Benito. The brief for Jacob, by attorney Wilson, says: "The record reveals a substantial body of evidence tending to implicate codefendant Daniel Juvera in the acts charged in the indictment." If that be conceded, the implication of Jacob must be conceded, for the evidence connecting Jacob and the acts was just as strong. It was Jacob whom Daniel called to the phone to answer Miramontes' inquiries; and when the three brothers, in the Buick, arrived at Brandi's it was Jacob who approached Miramontes. As Jacob's own brief states: "Upon the arrival of the three brothers at Brandi's Coffee Shop, appellant got out of the car, approached Miramontes, and asked if he, 'was the person'. * * * Appellant then got into Miramontes' car as a passenger and followed the brother's car to the Tick Tock Motel."

Benito's involvement is equally clear. It was he who was strategically located in unit 26 next to the phone booth. When the call came he immediately joined his brother in listening at the telephone. He knew what was afoot, for he undertook to challenge the agent who was approaching, saying "What do you want?" Benito's separate brief, by attorney Cardoza, concedes that the proof that Daniel and Jacob were in and drove the Plymouth was "substantial evidence to implicate [them] with possession of narcotics". As previously stated, the joint brief acknowledged that Benito was in the Plymouth for an "extremely short period of time." All this, along with the evidence that Benito drove all three together to Brandi's, after the telephone call, clearly shows a common participation in a joint enterprise. And the false statements made point most strongly to guilty knowledge.

The judgment is affirmed.